ELECTRON CORPORATION, Petitioner,

v.

The **INDUSTRIAL CLAIM APPEALS OFFICE OF the STATE of Colorado, the Colorado Division of Labor, Joseph L. Salazar, and the Subsequent Injury Fund of Colorado, Respondents.**

No. 90CA0544.

Colorado Court of Appeals,
Div. C.

Jan. 30, 1992.

Rehearing Denied March 12, 1992.

Certiorari Denied Aug. 10, 1992.

Glasman, Jaynes & McBride, Ronald C. Jaynes, Lydia W. Daugherty, Denver, for petitioner.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Michael J. Steiner, Asst. Atty. Gen., Denver, for respondents Industrial Claim Appeals Office of State, Colorado Div. of Labor, and Subsequent Injury Fund of Colorado.

Douglas R. Phillips, Denver, for respondent Joseph L. Salazar.

Opinion by Judge RULAND.

This case is before us pursuant to a mandate from our supreme court in *Subsequent Injury Fund v. Electron Corp.*, 817 P.2d 533 (Colo.1991). There, the court vacated our decision in *Electron Corp. v. Industrial Claim Appeals Office*, 817 P.2d 576 (Colo.App.1991) and directed us to reconsider our analysis in light of its decision in *Climax Molybdenum Co. v. Walter*, 812 P.2d 1168 (Colo.1991). In accordance with that latter holding, we affirm the order of the Industrial Claim Appeals Panel.

Claimant was exposed to significant amounts of silica dust and asbestos fibers during twenty-one and one-half years of employment as a foundry worker at Electron Corporation. In 1977, at age 38, claimant filed a workers' compensation claim for the occupational disease of silicosis. He was found to be fifty per cent permanently partially disabled and was awarded maximum permanent partial disability benefits of $26,292. The award was upheld by this court. *Electron Corp. v. Industrial Commission*, (Colo.App. No. 81CA1275, July 15, 1982) (not selected for official publication).

Claimant continued to work for Electron and suffered further injurious exposures to silica dust and asbestos fibers. He filed a second claim for workers' compensation benefits in February 1987, and became totally and permanently disabled from silicosis in May of 1987.

Claimant's sole exposure to silica dust occurred during his employment for Electron.

Both the Administrative Law Judge (ALJ) and the Panel ruled that the allocation of liability for permanent total disability benefits was controlled by § 8–51–112(1), C.R.S. (1986 Repl.Vol. 3B) (now codified at § 8–41–304(1), C.R.S. (1991 Cum. Supp.)), which imposes liability upon the last employer in occupational disease disability cases, rather than by § 8–51–106(1)(a), C.R.S. (1986 Repl.Vol. 3B) (now codified at § 8–46–101(1)(a), C.R.S. (1991 Cum.Supp.)), which allocates liability between the employer and the Subsequent Injury Fund (SIF) when a worker who previously sustained a permanent partial industrial disability becomes permanently and totally disabled as a result of a subsequent injury.

## I.

■ Electron contends that the Panel erred in finding it solely liable for claimant's permanent total disability under § 8–51–112(1). We disagree.

In *Climax Molybdenum Co. v. Walter,* *supra,* our supreme court addressed the relationship between § 8–51–106(1)(a) and § 8–51–112(1). Section 8–51–106(1)(a) apportions liability between the employer and the SIF in cases in which an employee is rendered totally and permanently disabled by the combined effect of two or more permanent partial disabilities. In contrast, § 8–51–112(1), establishes the "last injurious exposure" rule for disabilities attributable to occupational diseases. The court concluded that this latter rule is an exception to the general apportionment rule set forth in § 8–51–106(1)(a).

It ruled specifically that:

[T]he statutory provisions of section 8–51–112(1) are controlling on the liability of an employer or the employer's insurer for that portion of a worker's permanent total disability attributable to an occupational disease which, in combination with other industrial disabilities, contributes to the worker's permanent total disability.

Conversely, the court ruled that the SIF is liable under § 8–51–106(1)(a) only for "that part of the worker's permanent total dis-

ability attributable to those other prior industrial injuries *not involving an occupational disease."* (emphasis added)

Thus, since claimant's permanent total disability in this case is solely attributable to the occupational disease of silicosis, the Panel correctly applied § 8–51–112(1) in assessing Electron with full liability for claimant's disability benefits. *See Climax Molybdenum Co. v. Walter, supra.*

## II.

■ Alternatively, Electron challenges the constitutionality of the apportionment scheme established by § 8–51–106 and § 8–51–112. We perceive no constitutional defect.

The SIF is financed by assessments imposed uniformly on all Colorado employers and carriers. Section 8–51–106(1)(b), C.R.S. (1986 Repl.Vol. 3B) (subsequently amended and now codified at § 8–46–102, C.R.S. (1991 Cum.Supp.)). However, Electron argues that if a worker is totally and permanently disabled by multiple disabilities which include an occupational disease, the employer or its insurer will be liable for either a percentage of the permanent total disability benefits awarded, 100% of the benefits, or only $10,000 of the benefits depending on whether the employer's liability is assessed under § 8–51–106(1)(a), § 8–51–112(1), or § 8–51–112(2). Thus, Electron argues that the statutory scheme discriminates against employers of workers disabled by occupational diseases and violates the guarantees of equal protection under the United States and the Colorado constitutions. We disagree.

Since the equal protection challenge here involves neither a suspect classification nor an infringement of a fundamental right, the rational basis test applies in determining the classification's constitutionality. *People v. Rosburg,* 805 P.2d 432 (Colo. 1991).

■ Under this test, the party challenging the classification must prove beyond a reasonable doubt that the classification is not rationally based on legitimate differences and is not reasonably related to a

permissible state interest. If any state of facts can be conceived that would sustain the challenged classification, that state of facts will be presumed to exist in the absence of legitimate proof to the contrary. *Orsinger Outdoor Advertising, Inc. v. Department of Highways,* 752 P.2d 55 (Colo. 1988).

In this case, the classification is not affirmatively drawn but, rather, results from the overall statutory scheme for assessing and apportioning liability among different classes of employers. *See Bath v. Department of Revenue,* 758 P.2d 1381 (Colo. 1988).

Further, both § 8–51–106 and § 8–51–112 embody legitimate governmental interests. The purpose of the general apportionment rule under § 8–51–106(1)(a) is to encourage the employment of partially disabled persons. It does this by relieving employers who employ partially disabled persons from the full responsibility for permanent total disability resulting from a subsequent disabling injury. *Climax Molybdenum v. Walter, supra.*

The purpose of the last injurious exposure rule under § 8–51–112 is to provide a certain and expedient method of compensating workers disabled by occupational diseases.

Moreover, the statute has previously been upheld from constitutional challenge on equal protection grounds. *Union Carbide Corp. v. Industrial Commission,* 196 Colo. 56, 581 P.2d 734 (1978).

Accordingly, we find the statutory classification bears a rational relationship to legitimate state objectives and does not violate equal protection.

The order is affirmed.

PIERCE, J., concurs.

MARQUEZ, J., dissents.

Judge MARQUEZ dissenting.

I respectfully dissent.

The majority's reliance on *Climax Molybdenum Co. v. Walter,* 812 P.2d 1168 (Colo.1991) fails to consider significant factual and legal differences between that case and the one at issue here. In both cases the workers sustained multiple disabilities while employed by a single employer. However, the worker in *Climax* was permanently and totally disabled by the combined effect of two accidental injuries and an occupational disease. Significantly, the occupational disease was the final disabling injury. As a result, the employer in *Climax* was liable for only one-third of the worker's total permanent disability, and the Subsequent Injury Fund was liable for the remainder.

Here, in contrast, the worker was permanently and totally disabled by the combined effect of two occupational diseases. Under the majority's application of *Climax,* the employer here is solely liable for the worker's total permanent disability benefits and receives *no* contribution from the Subsequent Injury Fund.

Further, the employer effectively pays *twice* for the worker's prior occupational disease disability. In 1977, the employer paid maximum permanent partial disability benefits of $26,292 for the claimant's fifty percent permanent partial disability. Now that the worker has become totally and permanently disabled by the combined effect of the previous disability and his subsequent injurious exposure to silica dust, the employer is liable for 100 percent of the total permanent disability benefits.

This result contravenes the public policy underlying § 8–51–106(1)(a), C.R.S. (1986 Repl.Vol. 3B) (now codified as § 8–46–101(1)(a), C.R.S. (1991 Cum.Supp.)) of providing employment opportunities for partially disabled persons by relieving employers of the full responsibility for permanent total disability resulting from a subsequent industrial injury. Further, such a result is contrary to our supreme court's intent, which it expressed in *Climax* as follows:

It would be the antithesis of a just and fair result, in our view, were we to construe the Workers' Compensation Act to impose exclusive responsibility for permanent and total disability upon the sole employer when an occupational disease, which also is an injury for which the employer is solely responsible for any

resulting industrial disability, combines with other industrial injuries to cause the worker to be permanently and totally disabled.

In addition, the majority's application of *Climax* to the facts here results in a de facto classification of employers into at least two separate classes when apportioning liability for cumulative permanent partial disabilities: 1) employers whose workers are disabled by accidental injuries ("accidental injury employers") and 2), C.R.S. (1986 Repl.Vol. 3B) (now codified at § 8–41–304(2), C.R.S. (1991 Cum.Supp.)) employers whose workers are disabled by occupational diseases which do not qualify for SIF contribution under § 8–51–112(2), C.R.S. (1986 Repl.Vol. 3B) (now codified at § 8–41–304(2), C.R.S. (1991 Cum.Supp.)) ("occupational disease employers"). The resulting disparate treatment of the two groups is contrary to the legislative intent of providing a single, unified Workers' Compensation Act as evidenced by the repeal of the Occupational Disease Disability Act in 1975 and its merger into the Workmen's Compensation Act. *See* Tape Recording of the Senate Business Committee, 50th General Assembly, First Session (May 19, 1975); *see Krumback v. Dow Chemical Co.*, 676 P.2d 1215 (Colo.App.1983).

Under the majority's analysis, a "double" liability is imposed upon occupational disease employers in cases in which a worker has a prior permanent partial disability from an occupational disease and the corresponding percentage of the worker's permanent total disability attributable to the occupational disease does not qualify for SIF contribution under either § 8–51–106(1)(a) or § 8–51–112(2). *See Subsequent Injury Fund v. Grant*, 827 P.2d 574 (Colo.App.1991).

Contrary to the majority, I can find no legitimate state interest which is served by imposing a "double" liability on occupational disease employers. The question of double liability—and the ancillary issue of constitutional equal protection—was not presented in *Climax v. Molybdenum v. Walter, supra.*

In cases in which two or more permanent partial disabilities combine to render a worker permanently and totally disabled, § 8–51–106(1)(a) provides:

> [T]he employer in whose employ the employee sustained such subsequent injury shall be liable only *for that portion of the employee's industrial disability attributable to said subsequent injury,* and the balance of compensation due such employee on account of permanent total disability shall be paid from the subsequent injury fund.... (emphasis added)

The constitutional infirmity arises in cases in which a worker's *prior* permanent partial disability is an occupational disease. Because, under the *Climax* holding, SIF contribution is not available under § 8–51–106(1)(a), the employer responsible for the prior occupational disease either pays twice for the occupational disease, or that portion of the worker's total permanent disability which is attributable to the occupational disease goes uncompensated. *Subsequent Injury Fund v. Grant, supra.*

While equal protection of the laws does not demand that a statute or rule necessarily apply equally to *all* persons, it does require, under rational basis analysis, that a governmental classification which singles out a group of persons for disparate treatment be rationally founded on differences that are real and not illusory and that such classification be reasonably related to a legitimate state interest. *Tassian v. People,* 731 P.2d 672 (Colo.1987).

The apportionment scheme established by § 8–51–106 and § 8–51–112 discriminates against occupational disease employers and workers disabled by occupational diseases by restricting SIF coverage for occupational diseases to the specific diseases and circumstances enumerated in § 8–51–112(2). However, neither the statutory scheme nor the administrative record in this case establishes a rational basis for distinguishing between the two categories of employers for purposes of apportioning liability for subsequent injuries.

The SIF is financed by assessments imposed uniformly on *all* Colorado employers

and carriers. Section 8–51–106(1)(b), C.R.S. (1986 Repl.Vol. 3B) (subsequently amended and now codified at § 8–46–102, C.R.S. (1991 Cum.Supp.)). Therefore, employers of workers disabled by occupational disease are subject to the same mandatory assessments as are accidental injury employers.

Similarly, while there are obvious physiological differences between occupational diseases and accidental injuries, liability for both types of disabilities is governed by the same statutory benefits provisions, with *no* distinction between the two types of disabilities. Sections 8–51–101 to § 8–51–113, C.R.S. (1986 Repl.Vol. 3B) (now codified at § 8–42–101 to § 8–42–124, C.R.S. (1991 Cum.Supp.)). Thus, occupational disease employers pay the same types and amounts of benefits as do accidental injury employers.

Accordingly, because both classes of employers pay the same benefits and pay equivalent assessments to fund the Subsequent Injury Fund, I find no rational basis for the disparate treatment accorded to occupational disease employers.

The second prong of the rational-basis test requires a "serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals." *Austin v. Litvak*, 682 P.2d 41 (Colo.1984). A distinction between classes or groups of people must have some relevance to the purpose for which the classification is made. *Gallegos v. Phipps*, 779 P.2d 856 (Colo.1989).

The governmental purpose underlying § 8–51–112 is to facilitate litigation and establish a fixed liability in occupational disease cases. This interest, standing alone, is legitimate. *Union Carbide Corp. v. Industrial Commission*, 196 Colo. 56, 581 P.2d 734 (Colo.1978). However, the state's interest in fixing initial liability for occupational diseases is not implicated in cases of cumulative permanent partial disabilities involving *prior* occupational disease disabilities incurred by a worker while employed only by a single employer. In other words, the state's interest in initially determining liability for occupational diseases is not advanced by a statutory scheme which

makes occupational disease employers doubly liable for *prior* occupational diseases when the occupational disease *subsequently* combines with another occupational disease incurred while working for the same employer and renders a worker permanently and totally disabled.

Penalizing occupational disease employers, or workers disabled by occupational diseases, is contrary to the public policy of encouraging the employment of partially disabled workers. It also circumvents the legislative objective of providing a single, unified Workers' Compensation Act.

Concededly, the state could properly decide that a subsequent injury fund is unnecessary for either accidental injury employers or occupational disease employers. However, once the state *has* established and funded a scheme for providing employers relief from full liability in cases of cumulative partial disabilities, the scheme by which subsequent injury relief is accorded must have a rational basis. *Higgs v. Western Landscaping*, 804 P.2d 161 (Colo. 1991).

I find that the statutory classification which arises under §§ 8–51–106(1)(a) and 8–51–112 in apportioning liability for total permanent disability is arbitrary, unreasonable, and discriminatory. *See Stevenson v. Industrial Commission*, 190 Colo. 234, 545 P.2d 712 (1976). To sanction the disparate treatment accorded to occupational disease employers and their employees by the statutory apportionment scheme would subject the employers' and workers' equal protection rights to "unrestricted legislative license and would thereby deprive the equal protection principle of much of its meaningful content." *Higgs v. Western Landscaping, supra*.

Therefore, in my opinion, under the circumstances presented here, the statutory scheme, as interpreted by the majority, violates the guarantees of equal protection under the Fourteenth Amendment and Colo. Const. art. II, § 25. Accordingly, I would set aside the order and remand with directions that the benefits due claimant be

apportioned between Electron and the Subsequent Injury Fund.