**John H. WADDELL, Petitioner,**

v.

**The INDUSTRIAL CLAIM APPEALS OFFICE OF THE STATE OF COLORADO, Eugene & Francis Haskin, d/b/a Morning Star Arabians, Colorado Compensation Insurance Authority, and Subsequent Injury Fund, Respondents.**

No. 97CA0611.

Colorado Court of Appeals,
Div. III.

Jan. 22, 1998.

Rehearing Denied Feb. 26, 1998.

Certiorari Granted Oct. 19, 1998.

Crane and Tejada, P.C., Bethiah Beale Crane, Douglas R. Ware, Durango, for Petitioner.

No Appearance for Respondents Eugene & Francis Haskin.

Brandee DeFalco–Galvin, Curt Kriksciun, Denver, for Respondent Colorado Compensation Insurance Authority.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Roxane D. Baca, Assistant Attorney General, Denver, for Respondent Subsequent Injury Fund.

Opinion by Judge HUME.

In this workers' compensation proceeding, John Waddell (claimant) seeks review of the order of the Industrial Claim Appeals Office (Panel) which granted the claim of Eugene and Francis Haskin, doing business as Morning Star Arabians (employer), and their insurer, Colorado Compensation Insurance Authority (CCIA), for apportionment of liability. We affirm.

Claimant sustained an industrial injury to his back in 1992 while working for employer. Prior to that injury, claimant had suffered knee and ear injuries while in the military from 1979 to 1984 and had incurred another work-related injury in 1991, also while working for employer. The Administrative Law Judge (ALJ) found that claimant was permanently and totally disabled as a result of the combined effect of all of his injuries. Additionally, the ALJ attributed ten percent of claimant's disability to the military injuries, sixty percent to the 1991 injury, and thirty percent to the 1992 injury. Because the military injuries were non-industrial, the ALJ denied an offset to the Subsequent Injury Fund (SIF) and found employer and CCIA liable for 90% of claimant's permanent total disability (PTD) compensation.

On review, the Panel upheld the apportionment, but determined that employer and CCIA were liable for only 30% of the award.

## I.

Claimant first contends that the Panel erred when it determined that the SIF was not responsible for any part of the award. We disagree.

Injuries incurred during active military service are not considered industrial

injuries within the meaning of § 8–46–101, C.R.S.1997, the statute governing compensability under the SIF. *City & County of Denver v. Industrial Claim Appeals Office,* 892 P.2d 429 (Colo.App.1994). Consequently, the SIF is not liable, when, as here, a claimant's prior military-related injuries contribute to his total disability. *City & County of Denver v. Industrial Commission,* 690 P.2d 199 (Colo.1984)(SIF is not liable where the claimant's PTD is not caused exclusively by industrial disabilities).

Despite claimant's urgings to the contrary, we agree with the holding that injuries during military service are not industrial in nature and are bound by the precedential ruling regarding the scope of the SIF's liability.

## II.

In view of our holding that there is no SIF liability, claimant, alternatively, asserts that the Panel erred in finding employer liable for less than his full disability. Again, we disagree.

Section 8–42–104(2), C.R.S.1997, which governs apportionment, provides that:

> In case there is a previous disability, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury. In such cases awards shall be based on said computed percentage. Such computation, when applicable, shall be made in the following types of awards under articles 40 to 47 of this title: Permanent total, permanent partial, including scheduled, working unit, and lump sum; except that, in the event the provisions of section 8–46–101 are applicable, such apportionment shall not be made.

## A.

■ Claimant initially argues that the employer should be held liable for the entire disability under the "full responsibility" rule. We are not persuaded.

■ Pursuant to the full responsibility rule, an employer who hires a partially dis-abled employee is required to pay the entire disability award if the worker suffers another industrial injury and is declared permanently and totally disabled as a result. *Subsequent Injury Fund v. Thompson,* 793 P.2d 576 (Colo.1990). The rule operates in the absence of a statute authorizing apportionment. *Colorado Fuel & Iron Corp. v. Industrial Commission,* 151 Colo. 18, 379 P.2d 153 (1962).

Relying on *City & County of Denver v. Industrial Commission, supra,* claimant asserts that the full responsibility rule takes effect when no liability exists for the SIF. However, that case addressed only the question of SIF liability for non-industrial injuries, and not the application of § 8–42–104(2).

Further, in *Askew v. Industrial Claim Appeals Office,* 927 P.2d 1333 (Colo.1996)(fn.10), the supreme court recognized that the announcement of the full responsibility rule in *Colorado Fuel & Iron Corp. v. Industrial Commission, supra,* occurred prior to the existence of § 8–42–104(2), and does not operate to bar application of that statute.

Accordingly, because there was no SIF liability, § 8–42–104(2) was properly applied. *See Colorado Fuel & Iron Corp. v. Rhodes,* 166 Colo. 82, 441 P.2d 652 (1968)(upholding apportionment of successive industrial injuries incurred during employment with the same employer).

## B.

■ Claimant also contends that the apportionment of his disability under § 8–42–104(2) violates the equal protection guarantees of the Fourteenth Amendment and Colo. Const. art. II, § 25. We disagree.

■ When subjected to a constitutional attack, a statute is presumed to be constitutional, and the party challenging the statute bears the burden of proving it to be unconstitutional. *Firelock Inc. v. District Court,* 776 P.2d 1090 (Colo.1989); *Naiden v. Epps,* 867 P.2d 215 (Colo.App.1993).

■ Because fundamental rights are not implicated by the Workers' Compensation Act, § 8–40–101, et seq., C.R.S.1997, the rational basis test applies. *Industrial Claim*

*Appeals Office v. Romero*, 912 P.2d 62 (Colo. 1996).

 Under that standard, a statutory classification that singles out a group of persons for disparate treatment must be rationally based on differences that are real and not illusory, and must be reasonably related to a legitimate state interest. *Culver v. Ace Electric*, 952 P.2d 1200 (Colo.App.1997). If there exists any conceivable set of facts indicating that the classification serves a legitimate governmental purpose, the statute must be upheld against a facial attack regardless of whether its application may have a harsh impact. *Pace Membership Warehouse v. Axelson*, 938 P.2d 504 (Colo.1997).

Claimant argues that he is being denied benefits while an employee who becomes permanently and totally disabled as the result of one industrial accident receives a complete award of benefits. Because both the claimant and the hypothetical employee have sustained permanent and total disability, but only the hypothetical employee can recover full benefits, we conclude that disparate treatment has occurred. However, because we further conclude that such disparate treatment fulfills certain legitimate government interests, we find no denial of equal protection. *See Duran v. Industrial Claim Appeals Office*, 883 P.2d 477 (Colo.1994).

Apportionment addresses the problem that arises in instances in which the combined effect of successive injuries is far greater than would be reflected merely by adding the impairments for each separate injury. *See* 5 *Larson's Workers' Compensation Law* § 59.10 (1997). Apportionment ensures that the employer pays for only that portion of the employee's total disability that can be attributed to the subsequent injury, and therefore, it ameliorates the severe effect the full responsibility rule has on employers. *City & County of Denver v. Industrial Commission, supra*. Consequently, apportionment represents an accommodation of the stated legislative purposes of providing the quick and efficient delivery of benefits to injured workers at reasonable costs to employers. Section 8–40–102(1), C.R.S.1997; *Duran v. Industrial Claim Appeals Office, supra*.

Further, by limiting an employer's liability for compensation, apportionment promotes the additional statutory goal of encouraging the return of partially disabled workers to the work force. *See Climax Molybdenum Co. v. Walter*, 812 P.2d 1168 (Colo.1991); *Electron Corp. v. Industrial Claim Appeals Office*, 833 P.2d 821 (Colo.App.1992).

Thus, given the legitimate governmental purposes served by apportionment, the disparate treatment suffered by claimant or others situated similarly to him does not constitute a denial of the right to equal protection.

Finally, inasmuch as claimant does not contest the finding that he suffered from preexisting disabilities prior to the 1992 injury or the percentages assigned to those prior injuries, we conclude it is unnecessary to remand this matter.

The order is affirmed.

JONES, J., concurs.

BRIGGS, J., specially concurs.

Judge BRIGGS specially concurring.

I reluctantly concur in the majority's conclusions because of the current state of the law. As a result of the supreme court's decisions in *Askew v. Industrial Claim Appeals Office*, 927 P.2d 1333 (Colo.1996) and *City & County of Denver v. Industrial Commission*, 690 P.2d 199 (Colo.1984) (*Denver*), claimant's disability award is subject to apportionment and no recovery is available from the Subsequent Injury Fund (SIF). Further, despite the harsh impact, we cannot say that claimant has been denied the equal protection guarantees of the Fourteenth Amendment or Colo. Const. art. II, § 25.

I write separately not to express an alternative basis for reaching the majority's conclusion. I join the majority because the opinion follows, as it must, existing supreme court precedent. Nevertheless, this is "one of those rare cases" requiring further "pause." *See Texas v. Johnson*, 491 U.S. 397, 420, 109 S.Ct. 2533, 2548, 105 L.Ed.2d 342, 364 (1989) (Kennedy, J. concurring).

In short, I write separately to voice my distress with the undue personal toll being

exacted from permanently and totally disabled workers like claimant, and to suggest that this case offers an appropriate, if not compelling, vehicle for a revisit by the supreme court to the decisions that dictate our result. I also write to explain how our holding, even without supreme court review, is at least limited in scope as a result of recent amendments to the statutory apportionment scheme.

## I.

The supreme court in *Askew* addressed the interpretation of our apportionment statute, § 8–42–104(2), C.R.S.1997. That statute provides in pertinent part as follows:

> In case there is a previous disability, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury. In such cases awards shall be based on said computed percentage. Such computation, when applicable, shall be made in the following types of awards....: Permanent total, permanent partial, including scheduled working unit, and lump sum; except that, in the event the provisions of § 8–46–101 are applicable, such apportionment shall not be made.

The statute was construed in *Askew* in the context of an employer's claim for apportionment between an asymptomatic, preexisting condition and a work injury that, together, resulted in a permanent partial disability. Because the claimant's preexisting condition could not be considered a "disability," the court concluded apportionment under § 8–42–104(2) was not appropriate. That conclusion effectively resolved the issue presented.

Nevertheless, the supreme court went further and separately concluded that apportionment is appropriate under § 8–42–104(2) if a preexisting condition has been sufficiently identified, treated, or evaluated to be rated as a contributing factor in the subsequent disability. It does not matter that the preexisting condition resulted from a previous *non* occupational disability.

In contrast, twelve years earlier, in the *Denver* case, the supreme court had construed the predecessor of § 8–46–101(1)(a), C.R.S.1997, which provides for apportionment of responsibility between the last employer and the SIF for payment of permanent total disability benefits. The court there concluded that the statute applied only if *none* of the prior disability resulted from a nonoccupational disability.

In each case, the supreme court construed only one of the two statutes without addressing the other. Nevertheless, it is their combined impact so construed that, since *Askew* was announced, has created a new wave of appeals in which employers are arguing that disabled workers are entitled only to a small portion of permanent total disability benefits to which they would otherwise be entitled. *See Colorado Mental Health Institute v. Austill*, 940 P.2d 1125 (Colo.App.1997); *Baldwin Construction, Inc. v. Industrial Claim Appeals Office*, 937 P.2d 895 (Colo. App.1997).

It is that same combined impact that controls our conclusion today: Pursuant to § 8–46–101(1)(a) as construed in *Denver*, no recovery is available from the SIF to a disabled worker with any prior nonoccupational disability, no matter how slight; pursuant to § 8–42–104(2) as construed in *Askew*, even if benefits are not available from the SIF, the last employer is responsible for only that portion of the award attributable to the subsequent injury, no matter how small. Thus, a disabled worker like claimant cannot recover *any* of the balance of the award not paid by the last employer, even though virtually all of his total disability has resulted from successive *occupational* disabilities.

## II.

The impact of *Askew* and *Denver* will perhaps be less on workers permanently but partially disabled. For example, if a previous disability were occupational, the worker will typically have already been compensated for that disability. By providing compensation for the second disability, the worker in many cases will have received total compensation benefits not inordinately different from the award that would have been re-

ceived if the disability had resulted from a single occupational injury. Further, even if the combined disability is more severe than the sum of the two separate disabilities, the worker can presumably return to some sort of gainful employment and thus supplement the compensation benefits.

The impact on workers permanently and totally disabled is necessarily of a different magnitude, in part simply because workers generally receive permanent total disability benefits, not for a period of weeks, but until death. See § 8–42–111, C.R.S.1997. Further, the benefits are paid until death because the disabled worker can no longer engage in *any* gainful employment, see § 8–40–201(16.5), C.R.S.1997; *Colorado Mental Health Institute v. Austill, supra,* and thus can earn *no* steady income to supplement the award.

The weekly compensation available, while paid until death, is still limited to the amount of the benefits specified for injuries causing temporary total disability. See § 8–42–111. It is an award that, even without apportionment, in many cases is hardly sufficient. With apportionment, the impact on disabled workers can be, as in this case, devastating.

Here, the ALJ found that claimant was 38 years old at the time of the hearing and that his average weekly wage was $214.24. Pursuant to §§ 8–42–111(1) and 8–42–105(1), C.R.S.1997, claimant's weekly benefit is two-thirds of that amount, or $142.83 per week. Even though 90% of claimant's permanent and total disability is occupational, as a result of the combined impact of *Askew* and *Denver,* he will receive only 30% of the weekly benefit as compensation for his disability: $42.85 per week, or $2,228.148 per year.

Even if claimant had been eligible for the *maximum* weekly benefit available at the time of his most recent injury, on June 11, 1992, his compensation would have been limited to $395.71 per week. See § 8–47–106, C.R.S.1997; Order of July 1, 1991, of Kenneth M. Platt, Director, Division of Workers' Compensation, Department of Labor and Employment. Apportionment would reduce the compensation to 30% of that amount, $118.71 per week, or $6,173.07 per year—well below any standard of poverty and woefully insufficient to provide for a family's basic necessities.

The supreme court has not yet considered the proper construction of §§ 8–42–104(2) and 8–46–101(1)(a) in the context of a claim for permanent total disability benefits by a disabled worker like claimant. For this reason alone, further review would seem appropriate. As will be seen, it is not the only reason.

## III.

An understanding of how such a personal toll has come to be exacted from permanently and totally disabled workers requires an appreciation of the statutory and judicial histories that have led to our conclusion. A review of that history takes us on a curious journey.

### A.

The General Assembly's enactment in 1963 of the predecessor of § 8–42–104(2) appears to have been in response to the ruling in *Colorado Fuel & Iron Corp. v. Industrial Commission,* 151 Colo. 18, 379 P.2d 153 (1963) (*C.F.I.*). The supreme court there rejected the contention that apportionment was required for disability under the only statute then in effect concerning successive work injuries, the predecessor of § 8–42–104(1), C.R.S.1997.

In reaching its conclusion, the court in *C.F.I.* noted that states generally provide three kinds of statutes affecting workers who sustain successive disabilities. What was then a majority of states expressly directed the apportionment of disabilities. Others provided a subsequent injury fund to pay that portion of the benefit for which the last employer was not liable. Still others placed full responsibility on the last employer.

Colorado had already enacted the predecessor to § 8–46–101(1)(a), but it provided only "to a very limited extent" a subsequent injury fund, which covered certain scheduled injuries. Because of that limited scope, and because Colorado had not adopted a statute expressly providing for apportionment, the supreme court concluded that Colorado was

"definitely in the ranks of those states applying the full responsibility rule." *C.F.I., supra,* 151 Colo. at 18, 379 P.2d at 157.

Two months later, the General Assembly enacted the predecessor of § 8–42–104(2). *See* Colo. Sess. Laws 1963, ch. 180, § 81–8–2(2) at 641. Although the statute appears to have placed Colorado "definitely in the ranks of those states" providing for apportionment, it contained an important exception which remains in the statute today: "[I]n the event the provisions of [§ 8–46–101(1)(a) ] are applicable, such apportionment shall not be made." As noted, § 8–46–101(1)(a) provides its own form of apportionment, with the SIF responsible for the portion of the permanent total disability benefit not attributable to the most recent injury.

Many states have enacted statutory schemes with exceptions similar to that in § 8–42–104(2). The purpose is to soften the "apparent harshness" of an apportionment scheme that would otherwise deny a permanently disabled worker a full award of benefits. *See generally* 5 *Larson's Workers' Compensation Law,* § 59.21 at 10–492.357–58 (1997).

Hence, at the same time the General Assembly refused to place full responsibility on the last employer, it sought to protect disabled workers from any reduction in benefits, at least in the case of the typical scheduled injury. For those injuries, if apportionment of disability was required, the SIF would be liable for that portion of the compensation benefits not payable by the last employer.

Ten years later, the General Assembly amended the predecessor of § 8–46–101(1)(a) to provide that benefits could be recovered from the SIF only in the case of permanent total disability benefits. *See* Colo. Sess. Laws 1973, ch. 271 § 81–12–7 at 947. However, two years after that, it again amended the statute. No longer did the statute apply only when the previous injury had been a scheduled injury. Instead, the SIF was liable so long as the previous injury resulted in a permanent partial industrial disability:

> In a case where an employee has previously sustained permanent partial industrial disability and in a subsequent injury sustains additional permanent partial indus-

trial disability and it is shown that the combined industrial disabilities render the employee permanently and totally incapable of steady gainful employment and incapable of rehabilitation to steady gainful employment, then the employer in whose employ the employee sustained such subsequent injury shall be liable only for that portion of the employee's industrial disability attributable to said subsequent injury, and the balance of compensation due such employee on account of permanent total disability shall be paid from the subsequent injury fund as is provided in this section.

*See* Colo. Sess. Laws 1975, ch. 71, § 8–51–106 at 302.

At this point, last employers were protected from the harsh impact of full responsibility for permanent total disability benefits, pursuant to the predecessor of § 8–42–104(2). At the same time, by making the SIF responsible for payment of the balance of permanent total disability benefits in any case in which the worker had sustained an earlier permanent partial industrial disability, it appeared that disabled workers were now protected from the harsh impact of having their permanent total disability awards reduced, pursuant to the newly amended predecessor of § 8–46–101(1)(a).

Thus, the two statutes had been reconciled in a way that fairly protected the financial interests of permanently and totally disabled workers, as well as last employers. Or so it seemed.

### B.

Almost a decade later, the supreme court in *Denver* was asked to construe the predecessor of the SIF statute, § 8–46–101(1)(a). The claimant had sustained, in addition to the most recent occupational disability, previous occupational disabilities, all of which contributed to his permanent and total disability. Nevertheless, the supreme court concluded that, because the claimant also had a prior nonoccupational disability, the SIF could not be held liable for *any* part of the claimant's permanent total disability award.

The parties in *Denver* apparently had not raised, and the supreme court did not address, the impact of its holding when combined with the predecessor of the other apportionment statute, § 8–42–104(2). Thus, it did not consider alternative constructions of the SIF statute that would have reconciled the two.

For example, the SIF statute could have been construed to provide for recovery from the SIF, even if some portion of a total disability resulted from a preexisting nonoccupational disability, so long as there had been, in addition to the most recent occupational disability, at least one previous occupational disability.

As another alternative, the SIF statute could have been construed so that the SIF would be responsible for that portion of the permanent total disability award attributable to previous occupational disabilities, but not that attributable to any nonoccupational disabilities or the most recent injury. The last employer would be responsible for the percentage of the total disability attributable only to the most recent injury, thereby avoiding full responsibility. The disabled worker would be responsible for, and thus not recover, that percentage of the total disability attributable to nonoccupational disabilities. The worker would, however, at least be able to recover all benefits attributable to occupational disabilities.

Interestingly, the supreme court in *Denver* did not merely construe the predecessor of § 8–46–101(1)(a) in isolation. Because it did not consider the predecessor of § 8–42–104(2), the court also affirmed without discussion the Industrial Commission's separate conclusion that the last employer was *fully responsible* for payment of the claimant's permanent total disability benefits.

Thus, notwithstanding the existence of the predecessor of § 8–42–104(2), it appeared that, pursuant to *Denver*, workers remained entitled to a full award of permanent total disability benefits. However, it was now at the expense of last employers, who were once again fully responsible for those benefits. *Cf. Subsequent Injury Fund v. Thompson*, 793 P.2d 576 (1990); *Seifried v. Industrial Commission*, 736 P.2d 1262 (Colo.App.1986);

*State Compensation Insurance Fund v. Industrial Commission*, 697 P.2d 807 (Colo. App.1985). Or so it seemed.

## C.

Twelve years later the supreme court in *Askew* for the first time addressed the proper construction of § 8–42–104(2). In reaching the conclusion that the statute requires apportionment of a nonoccupational preexisting condition, the court stressed the importance of construing a comprehensive regulatory scheme like the Workers' Compensation Act as a whole, giving effect to all its parts "within the context of the entire scheme." *Askew v. Industrial Claim Appeals Office*, *supra*, 927 P.2d at 1337.

However, the claim in *Askew* was for permanent partial benefits, not permanent total. Thus, the parties apparently did not question and, understandably, the supreme court did not address, any possible relationship between the apportionment statute, § 8–42–104(2), and the SIF statutes applicable only to claims for permanent total disability benefits, including § 8–46–101(1)(a). Hence, the court in *Askew* did not consider whether it should overrule that portion of the decision in *Denver* affirming the Industrial Commission's ruling that the last employer was fully responsible for payment of the claimant's permanent total disability benefits—even though its decision effectively did so. Nor did the court in *Askew* have occasion to consider whether, as a result of its construction of § 8–42–104(2), it should also reconsider the construction the court in *Denver* had given to the predecessor of § 8–46–101(1)(a)—even though the combined result of the two decisions leaves a permanently and totally disabled worker like claimant in a dire predicament.

In my view, in light of the curious history of these apportionment statutes, which has resulted in an unduly harsh, and apparently unintended, impact on permanently and totally disabled workers like claimant, a revisit by the supreme court to its decisions in *Askew* and *Denver* would seem appropriate. In particular, this case presents an ideal opportunity to reconsider the proper con-

struction to be given § 8–46–101(1)(a) "within the context of the entire scheme."

### IV.

A review of the history of our apportionment statutes cannot conclude without noting amendments enacted in 1992 and 1993. These amendments are worthy of at least brief discussion, both because they may be relevant in the event of further review in this case, and because, even if our decision must stand, the amendments delineate the limited scope of our holding.

In 1992, the General Assembly substantially amended the SIF statutes, adding, among other provisions, § 8–46–104, C.R.S.1997. It provides that no cases shall be accepted into the SIF for subsequent injuries occurring on and after July 1, 1993. *See* Colo. Sess. Laws 1992, ch. 238 § 8–46–104 at 1830. The purpose of its enactment was to address the escalating cost of the SIF, which had run out of funds. *See* Hearing on H.B. 1280 Before the House Labor and Industry Committee, 58th Gen. Assembly, 2d Reg. Sess. (Hearing Tape of February 19, 1992, at 9:59 a.m.); Hearing on H.B. 1280 Before the Senate Committee on Business Affairs and Labor, 58th Gen. Assembly, 2d Reg. Sess. (Hearing Tape of April 1, 1992, at 3:36 p.m.).

Of equal interest was another new provision added by the 1992 amendments, § 8–46–105, C.R.S.1997. It established an alternative funding mechanism:

Effective July 1, 1993 [the same day the SIF was to close] in any case in which an employee previously has sustained permanent partial disability and, in a subsequent injury, sustains additional permanent partial disability and it is shown that the combined industrial disabilities render the employee permanently and totally disabled, then the premiums of the employer in whose employ the employee sustained such subsequent injury shall be determined only on the basis of such subsequent injury and not on the basis of the employee's permanent total disability. The total cost of the employee's permanent total disability shall not be considered in determining the employer's premiums, but shall be considered by the commissioner of insur-

ance in setting rates. The insurance carrier. or self-insured employer may seek indemnification from any previous employer of the injured employee for a share of benefits proportional to their liability.

Colo. Sess. Laws 1992, ch. 238, § 8–46–105 at 1831.

What is of interest is that, in enacting § 8–46–105, the General Assembly, like the supreme court in the *Denver* case, assumed and accepted an important concept: In the absence of SIF liability, the last employer is fully responsible for permanent total disability benefits. Actual payment is made by the employer's insurance carrier, with the financial consequence to the last employer tempered by apportioning any resulting increase in the cost of insurance between the last employer and other employers. *See* Hearing on H.B. 1280 Before the House and Senate Conference Committee, 58th Gen. Assembly, 2d Reg. Sess. (Hearing Tape of May 5, 1992 at 6:10 p.m.); *see also* Hearing on H.B. 1280 Before the Senate Committee on Business Affairs and Labor, *supra* (Hearing Tape of April 1, 1992, at 3:43 p.m.).

It is also worth noting that the General Assembly did not simply eliminate §§ 8–42–104(2) and 8–46–101(1)(a), and appropriately so. By keeping these statutes, the General Assembly maintained a statutory scheme applicable to a disability from a subsequent injury sustained between the date the amendments were enacted and the date the SIF was to close, as well as to claims reopened in later years but involving a disability from a subsequent injury sustained before the SIF was closed. Indeed, the prediction was that the SIF would have to continue responding to such claims for another thirty years. *See* Hearing on H.B. 1280 Before the Senate Committee on Business Affairs and Labor, *supra* (Hearing Tape of April 1, 1992, at 3:43 p.m.).

The following year, in 1993, the General Assembly did delete the last sentence of § 8–46–105, which provided for indemnity by previous employers. *See* Colo. Sess. Laws 1993, ch. 351, § 8–46–105 at 2142. That sentence had been separately added to § 8–46–105 in 1992. *See* Hearing on H.B. 1280 Before the

House and Senate Conference Committee, 58th Gen. Assembly, 2d Reg. Sess. (Hearing Tape of May 6, 1992, at 8:42 a.m.). The sentence was deleted because it created difficulty in settling claims that "could go back and back and back." *See* Hearing on H.B. 1356 Before the House Committee on Labor and Industry, 59th Gen. Assembly, 1st Reg. Sess. (Hearing Tape of May 6, 1993, at 2:30 p.m.). Thus, a previous employer and its carrier could have closed the disabled worker's records years earlier. Further, if the prior employer had gone out of business or changed carriers, the prior carrier could have been unable to recoup any of the cost of benefits paid by increasing the prior employer's premium base.

In place of the deleted sentence, a new sentence was added to § 8–46–105, permitting the last employer to dispute the impairment rating for the subsequent injury. That rating determines the percentage of the disability the last employer's carrier can include in the determination of that employer's future premium base. Hence, the basic concept of full responsibility on the last employer, with the financial consequences tempered, remains unchanged.

A statutory scheme that provides a permanently and totally disabled worker with a full award of compensation benefits is consistent with the modern approach to resolving the problem of successive disabilities leading to permanent and total disability. As noted, at the time of the supreme court's decision in *C.F.I.* in 1963, the majority of states did apportion disability. However, in the intervening years most states have come to recognize the unfair impact of a scheme of apportionment that·awards a permanently and totally disabled worker only that percentage of benefits equal to the percentage of the disability attributable to the most recent work injury. Thus, the legislatures in the "great majority" of states have abandoned such schemes. *See generally* 5 *Larson's Workers' Compensation Law,* § 59.21, *supra,* at 10–492.340 and 10.492.359.

The courts have been part of the modern approach. They have likewise acted to temper the impact of any statutory scheme that would appear to deprive a disabled worker of a full award of permanent total disability benefits. *See generally* 5 *Larson's Workers' Compensation Law, supra,* § 59.21 at 10–492.359 ("The courts, for their part, have generally tempered the harshness of apportionment statutes whenever a doubt could be resolved in the direction of constricting their scope.").

The new statutory scheme is in many ways on the "cutting edge" of the modern approach by creating a hybrid of all three earlier statutory schemes. The result is a modified form of full responsibility that provides the permanently and totally disabled worker with a full award of compensation benefits, while balancing the competing interests of the disabled worker, the last employer, the claimant's previous employers, all other employers, and employers' insurance carriers.

In sum, this court cannot avoid the unfortunate conclusion we reach today. Only the supreme court can revisit the decisions that dictate our result. However, while of little solace to claimant, our holding is at least limited in scope to those cases involving a disability from a subsequent injury sustained prior to July 1, 1993, the effective date of the amended statutory scheme. Judicial review of cases involving a disability from a subsequent injury sustained after July 1, 1993, will await another day.