**UNITED AIRLINES, INC., Petitioner,**

v.

**INDUSTRIAL CLAIM APPEALS OF-FICE of the State of Colorado; Howard R. Bowland; and The Subsequent Injury Fund, Respondents.**

No. 98SC657.

Supreme Court of Colorado,
En Banc.

Jan. 24, 2000.

Clifton, Hook & Bovarnick, P.C., Clyde E. Hook, Harvey D. Flewelling, Denver, Colorado, Attorneys for Petitioner.

Timothy Quinn, Denver, Colorado, Attorney for Respondent Howard R. Bowland.

Curt Kriksciun, Colorado Compensation Insurance Authority, Denver, Colorado, Amicus for Colorado Compensation Insurance Authority.

Weinberger & Kanan, P.C., Thomas L. Kanan, Trecia L. Sigle, Denver, Colorado, Amicus for Colorado Defense Lawyers Association.

Gordon & Macdonald, P.C.,William J. Macdonald, Denver, Colorado, Amicus for Worker's Compensation Education Association.

Chief Justice MULLARKEY delivered the Opinion of the Court.

In *Bowland v. Industrial Claim Appeals Office*, 984 P.2d 660 (Colo.App.1998), the court of appeals ordered the Industrial Claim Appeals Office (ICAO) to require United Airlines, Inc. (United), to pay Howard Bowland (Bowland) a full award of permanent total disability benefits under the Workers' Compensation Act of Colorado (the Act), sections 8–40–101 to 8–47–209, 3 C.R.S. (1999). We granted certiorari to determine whether the court of appeals erred by holding that sections 8–42–104(2), 3 C.R.S. (1998), and 8–46–105(1), 3 C.R.S. (1999), do not require the administrative law judge (ALJ) to reduce Bowland's disability award by the percentage of his permanent total disability attributable to a preexisting permanent partial industrial disability.[1] We now affirm the court of appeals' decision.

This case requires us to refer extensively to four separate statutory provisions of the Act. For the sake of clarity, we refer to section 8–42–104, 3 C.R.S. (1998), as "the previous disability statute," section 8–46–101, 3 C.R.S. (1999), as "the SIF statute," section 8–46–104, 3 C.R.S. (1999), as "the SIF closure statute," and section 8–46–105(1) 3 C.R.S. (1999), as "the insurance premium statute." The previous disability and insurance premium statutes are appended to this opinion.

## I.

Bowland worked as a baggage handler for United. On August 3, 1993, in the course of his employment, he sustained an injury to his back. He subsequently filed a workers' compensation claim for an award of permanent total disability benefits.

Following a hearing to determine the nature and extent of Bowland's injuries, the ALJ found that Bowland was permanently and totally disabled. The ALJ further determined that, at the time of his August 3, 1993 injury, Bowland suffered from a preexisting partial disability.

According to the ALJ's findings, Bowland had sustained a series of occupational injuries between April 1988 and September 1990. Each of these injuries occurred in the course of his employment with United. After recovering from surgery to repair his cumulative injuries, Bowland returned to work for United and performed his regular duties. The ALJ determined that, at the time of the 1993 injury, the cumulative effects of Bowland's occupational injuries had resulted in a nine percent permanent medical impairment.

---

1. In April 1999, the General Assembly amended section 8–42–104(2) in its entirety. *See* ch. 141, sec. 1, § 8–42–104, 1999 *Colo. Sess. Laws* 410. Because these amendments apply to injuries oc-curring on or after July 1, 1999, *see id.,* sec. 2, at 411, we consider the text of section 8–42–104(2) only as it existed prior to the amendment.

Four months after his August 1993 back injury, Bowland reached maximum medical improvement and was placed on permanent physical restrictions that prevented his return to work for United. Bowland's physician restricted him from bending, lifting, pushing, twisting, crawling, and working from heights. In December 1996, Bowland's physician reported additional permanent restrictions on standing, walking, and sitting and noted that Bowland could work for no more than two hours per day.

Based on his findings and his interpretation of the Act's previous disability statute, the ALJ ordered United to pay Bowland an award amounting to 91% of the permanent total disability benefits for which he was eligible under the Act. Additionally, the ALJ concluded that Colorado's Subsequent Injury Fund (SIF) was not liable for the remainder of Bowland's permanent total disability benefits, because the SIF closure statute precludes SIF liability where the last injury contributing to a worker's permanent total disability occurred on or after July 1, 1993. Consequently, the ALJ's decision resulted in a nine-percent reduction of Bowland's permanent total disability benefits.

Bowland appealed the ALJ's order to the ICAO, seeking to hold United liable for 100% of his permanent total disability benefits. By final order dated September 19, 1997, however, the ICAO affirmed the ALJ's order.

In a unanimous decision, the court of appeals reversed the ICAO's order. *See Bowland,* 984 P.2d at 665. It reasoned that the General Assembly, in enacting the insurance premium statute, intended to place full liability for permanent total disability benefits on the last employer of an employee who, previously having sustained an industrial injury causing permanent partial disability, sustains a subsequent industrial injury resulting in permanent and total disability. *See id.* at 663–65. Accordingly, the court of appeals remanded the case for entry of an order requiring United to pay the balance of Bowland's permanent total disability benefits.

II.

To understand the present dispute between Bowland and United, we must examine the state of the law prior to the General Assembly's closure of the SIF to injuries occurring on or after July 1, 1993. Indeed, United's argument depends on its theory that, by closing the SIF to new injuries, the General Assembly intended a radical reduction in the amount of benefits available to a claimant whose preexisting industrial disability combines with a subsequent occupational injury to render him permanently and totally disabled. Accordingly, we provide a brief background of the SIF and apportionment in Colorado.

Among the issues the General Assembly addressed when it drafted the 1919 version of the Act was whether and to what extent the existence of a preexisting partial disability limits an employee's benefit award in the event of a subsequent permanent total disability. Although the 1919 Act stated that a preexisting disability would not preclude compensation for a later injury, it did not provide a mechanism to limit an employer's liability in cases where an employee suffered from a preexisting permanent partial disability at the time of his last injury. *See* ch. 210, sec. 48, 1919 Colo. Sess. Laws 700, 717 (enacting the predecessor to subsection (1) of the previous disability statute). Not until 1945, when the General Assembly first established the SIF, were employers able to avoid the full costs of permanent total disability benefits in a narrow class of qualifying cases. *See* ch. 164, sec. 1, § 355, 1945 Colo. Sess. Laws 447, 447–48.

In *Colorado Fuel & Iron Corp. v. Industrial Commission of Colorado,* 151 Colo. 18, 379 P.2d 153 (1962), we held that section 81-8-2, 4 C.R.S. (1953), the predecessor to subsection (1) of the previous disability statute, established the "full responsibility rule" in cases where an employee sustained a permanent total disability. Whereas many states had adopted apportionment statutes in conjunction with comprehensive subsequent injury funds, Colorado had no such apportionment statute and only a very limited subsequent

injury fund.[2] Thus, applying the full responsibility rule, we held that "[w]hen an employer hires an employee who, by reason of a pre-existing condition or by reason of a prior injury, is to some extent disabled, he takes the man with such handicap." *Id.* at 26, 379 P.2d at 158. Accordingly, we held that the claimant, a worker who had suffered an injury that rendered him 30% partially disabled, was entitled to recover from his employer a full award of benefits when a subsequent injury left him permanently and totally disabled. *See id.* at 27, 379 P.2d at 158.

At the time of our decision in *Colorado Fuel*, problems with the full responsibility rule were evident and well-recognized. *See* 5 Arthur Larson and Lex K. Larson, *Larson's Workers' Compensation Law* § 91.01[1], at 91–2 to –4 (1999). The rule resulted in hardship to employers and employees alike. Employers, forced to bear the full cost of disabilities, tended not to hire partially disabled workers, since those workers were more susceptible to disproportionately expensive total disabilities.[3] *See id.* at 91–3.

Shortly after this court's decision in *Colorado Fuel*, the General Assembly amended the Act to provide for apportionment of disability benefits. *See* ch. 180, sec. 2, § 81–8–2, 1963 Colo. Sess. Laws 640, 640–41. The General Assembly included an exception to the apportionment rule for cases of permanent total disability eligible for compensation under the SIF statute. *See id.*

In 1975 the General Assembly repealed and reenacted a substantial portion of the SIF statute. *See* ch. 71, secs. 31–32, § 8–51–106, 1975 Colo. Sess. Laws 290, 302. The amendments extended SIF liability to cover all cases in which an employee already suffering from a partial industrial disability sustained an additional industrial injury causing a permanent partial disability, the combination of which resulted in permanent total disability. *See id.*

For nearly thirty years, the SIF statute provided for apportionment of liability for permanent total disabilities between the employee's last employer and the SIF. In 1992, however, the General Assembly decided to close the SIF to injuries occurring on or after July 1, 1993.[4] *See* ch. 238, sec. 5, § 8–46–104, 1992 Colo. Sess. Laws 1828, 1830. Also at this time, the General Assembly enacted the insurance premium statute. *See id.* § 8–46–105, at 1831.

Since *Colorado Fuel* we have continued to assume that the last employer bears full responsibility for the claimant's permanent total disability in cases where the SIF is not liable for a portion of the compensation. *See Subsequent Injury Fund v. Thompson*, 793 P.2d 576, 578 (Colo.1990); *City & County of Denver v. Industrial Comm'n*, 690 P.2d 199, 202 (Colo.1984) [hereinafter *Hatch* ].

In *Hatch*, we noted that the SIF statute permits an employer to apportion liability between itself and the SIF when an employee suffers successive permanent partial industrial disabilities, the combined effect of which renders him permanently and totally disabled. *See Hatch*, 690 P.2d at 201. Where one or more nonindustrial disabilities contribute to the permanent total disability, however, the SIF is not liable for any portion of the disabled employee's compensation. *See id.* at 203. Thus, we held that the SIF statute precluded compensation by the SIF where the claimant's nonindustrial glaucoma, arthritis, asthma, alcohol abuse, and obesity, in addition to a preexisting industrial disability, combined with a subsequent industrial disability to cause his permanent total disability. *See id.*

Although the issue before us in *Hatch* was whether the Act required the SIF to pay a

---

**2.** In 1962, Colorado's subsequent injury fund provided compensation only when an employee who had lost a hand, arm, foot, leg, or eye in a previous industrial injury lost another hand, arm, foot, leg, or eye in a subsequent industrial injury. *See* § 81–12–7, 4 C.R.S. (1953); *Colorado Fuel*, 151 Colo. at 26, 379 P.2d at 157.

**3.** "When loss of a single eye might mean a compensation liability of $5,000 for a worker with two good eyes but $26,000 for a worker with only one, the compensation insurance premium on the latter would naturally be markedly greater." 5 Larson, *supra*, § 91.01[1], at 91–2 to –3.

**4.** Several other states also have passed legislation eliminating their subsequent injury funds. *See* 5 Larson, *supra*, § 91.03[8], at 91–56 to –57.

portion of the claimant's benefits, our decision rested on the implicit assumption that, absent SIF liability, the last employer would remain liable for the full measure of benefits to which the claimant was entitled. We observed that

> [t]he purpose of establishing the SIF was to provide partially disabled workers with added opportunities for employment by relieving subsequent employers from the harsh results of the "full responsibility" rule. Before the SIF was created, an employer who hired a partially disabled worker was responsible for the entire disability award if the worker suffered a subsequent injury and was declared permanently and totally disabled. In those limited circumstances provided by statute, affected employers may now seek to apportion liability between themselves and the SIF when a worker suffers at least two accidents, each resulting in permanent partial industrial disability, and the combined effect of his industrial disabilities renders him permanently and totally disabled.

*Hatch,* 690 P.2d at 202 (citations omitted); *see also Thompson,* 793 P.2d at 578–79. Thus, we presumed that the employer remained responsible for the employee's benefits unless the employer could apportion part of the costs to the SIF.[5] As noted by Justice Quinn in dissent, the majority's decision in *Hatch* placed full liability for an employee's permanent total disability benefits on the last employer. *See id.,* 690 P.2d at 205–07 (Quinn, J. dissenting).

In *Thompson,* we declined to extend our reasoning in *Hatch* to preclude SIF liability when a dormant preexisting condition makes an employee more susceptible to permanent total disability. *See Thompson,* 793 P.2d at 579–80. The claimant in *Thompson* suffered two separate work-related heart attacks. The first caused a partial disability, and the second resulted in permanent total disability. We held the SIF liable for the portion of the claimant's disability compensation attributable to the first heart attack even though he had developed atherosclerosis prior to that

injury. *See id.* Atherosclerosis itself did not constitute a preexisting disability under the SIF statute. *See id.* Again, we based our decision partially on our understanding that the Act places full responsibility on the last employer unless it can apportion part of the liability to the SIF. *See id.* at 578–79. Consequently, at the time the General Assembly enacted the SIF closure statute in 1992, our decisions in *Hatch* and *Thompson* strongly indicated that, under the Act, the last employer bears the full costs of an employee's permanent total disability unless the provisions of the SIF statute apply.

In *Askew v. Industrial Claim Appeals Office,* 927 P.2d 1333 (Colo.1996), we addressed whether the previous disability statute required apportionment where the claimant's preexisting asymptomatic degenerative disease, combined with an industrial accident, resulted in permanent partial disability. We held that, because the claimant's degenerative condition did not amount to a preexisting industrial disability, the employer was not entitled to apportionment pursuant to the previous disability statute. *See id.* at 1339.

United interprets *Askew* to require apportionment in all cases where (1) the claimant suffers from a preexisting disability at the time of his subsequent industrial injury, and (2) the SIF cannot be held liable for a portion of the award under the SIF statute. We reject that interpretation.

The prior condition at issue in *Askew,* a preexisting asymptomatic degeneration of the claimant's spine, was not an industrial disability. *See id.* at 1337. Furthermore, *Askew* involved a claim for permanent partial disability benefits, not permanent total disability benefits. *See id.* at 1335. Accordingly, the case now before us presents a different issue from the one we addressed in *Askew.* The question we must answer is whether the Act requires a reduction of the claimant's benefits under circumstances in which the SIF would have been liable had the injury occurred prior to July 1, 1993. That question is a matter of law to be decid-

---

5. In *Hatch,* we did not consider the applicability of the previous disability statute to the claimant's

award of permanent total disability benefits.

ed by analyzing the statutes and relevant case law.

## III.

United contends that the court of appeals failed to give effect to the plain meaning of the previous disability statute by holding it liable for 100% of Bowland's disability benefits. According to United, the previous disability statute clearly requires "apportionment"—or, more aptly, reduction—of permanent total disability benefits in cases where a preexisting permanent partial disability exists at the time of the last injury contributing to the employee's permanent total disability.[6] Citing *Askew*, United argues that this court has interpreted the previous disability statute to require apportionment of permanent total disability benefits in cases such as the one now before us.

Bowland responds that the previous disability statute must be harmonized with the Act's other statutory provisions. According to Bowland, the SIF statute *requires* apportionment of disability benefits between the SIF and the last employer in cases where multiple disabilities caused by industrial injuries occurring prior to July 1, 1993 combine to render the claimant permanently and totally disabled. The insurance premium statute, on the other hand, governs similar claims in cases where the last injury contributing to the claimant's permanent total disability occurs on or after July 1, 1993 but places full liability for disability benefits on the last employer. The previous disability statute applies to all other claims for permanent total disability benefits not governed by the SIF and insurance premium statutes, where both industrial and non-industrial disabilities contribute to the claimant's permanent total disability.

We are not persuaded by United's argument that the previous disability statute requires a reduction of Bowland's permanent total disability benefits. Bowland's construction of the previous disability and insurance premium statutes gives effect to the General Assembly's intent. United's theory does not. Our review of the relevant statutory provisions, the legislative history, this court's precedent, and the policy behind workers' compensation in Colorado satisfies us that the court of appeals correctly held United liable for 100% of Bowland's permanent total disability benefits.

## A.

■ This case requires us to interpret several statutory provisions of the Act. The interpretation of these statutes presents questions of law subject to de novo review. *See Robles v. People*, 811 P.2d 804, 806 (Colo. 1991).

■ As always we strive to give effect to the General Assembly's intent. *See Askew*, 927 P.2d at 1337. When the General Assembly adopts a comprehensive regulatory scheme, we must construe the legislation as a whole and, where possible, give a harmonious effect to each of its parts. *See* § 2–4–201(1)(b), 1 C.R.S. (1999); *Askew*, 927 P.2d at 1337. If the statutory language is unambiguous, we presume the General Assembly meant what it clearly said. *See Askew*, 927 P.2d at 1337. Otherwise, we resort to rules of statutory construction. *See id.*

■ We find the previous disability and insurance premium statutes ambiguous on their face. The previous disability statute purportedly applies to awards of permanent total disability benefits except in cases where "the provisions of [the SIF statute] are applicable." *See* § 8–42–104(2). Nevertheless,

**6.** As used by United, the term "apportionment" is something of a misnomer. The previous disability statute ostensibly requires apportionment of liability in cases where an employee with an existing disability suffers an industrial injury resulting in a greater disability. *See* § 8–42–104(2). We note that, theoretically, liability could be apportioned between the last employer and either one or more prior employers or, when applicable, the SIF. *See* 5 Larson, *supra*, § 90.02, at 90–3 to –4.

In this case, however, United is both the last employer and the prior employer. Not surprisingly, it urges that the previous disability statute requires not that liability be apportioned between the last employer and previous employers, but rather that liability be "apportioned" between United and Bowland. Thus, United's interpretation of the previous disability statute does not apportion liability, but merely reduces the claimant's award of benefits.

we previously have interpreted the Act to place full liability on the last employer where the claimant's preexisting disabilities combined with a subsequent industrial disability to render him permanently and totally disabled and where the SIF was not liable for part of the claimant's compensation. *See Hatch,* 690 P.2d at 202; *id.* at 205–07 (Quinn, J., dissenting). Accordingly, we have understood the Act not to require a reduction of the last employer's liability in cases of permanent total disability where the provisions of the SIF statute are inapplicable.

The text of the insurance premium statute casts further doubt on the applicability of the previous disability statute to awards of permanent total disability benefits under circumstances where the SIF is not liable for a portion of the compensation. On its face, the insurance premium statute regulates the calculation of insurance premiums and rates in cases where an employee's preexisting industrial disability combines with a subsequent industrial disability to render the employee permanently and totally disabled. *See* § 8–46–105(1). When calculating insurance premiums, insurers may consider only the impairment rating of the employee's last injury and not "the total cost of the employee's permanent total disability." [7] *See id.* Nevertheless, the total cost of the permanent total disability is considered by the commissioner of insurance in setting insurance rates. *See id.* Thus, the statute provides that the insurer must set the last employer's premiums as though the injury had caused only a permanent partial disability, not a permanent

total disability.[8] The insurer's rates, in contrast, are based on the total cost of the permanent total disability award.

To understand the insurance premium statute, however, we must determine what the General Assembly intended by "[t]he total cost of the employee's permanent total disability." *See* § 8–46–105(1). Two interpretations are possible. First, the General Assembly may have meant the full measure of benefits available to permanently and totally disabled workers under the Act. Alternatively, it could have been referring to the cost of a permanent total disability to the last employer after reducing the award pursuant to the previous disability statute.

The first interpretation supports Bowland's argument that the General Assembly intended the last employer to pay 100% of the claimant's permanent total disability benefits in cases where one or more preexisting industrial disabilities contribute to the permanent total disability. If insurance rates are calculated based on the full amount of permanent total disability benefits available under the Act, then the insurance premium statute does not make sense unless employers are liable for 100% of those benefits. Otherwise, the insurance rates established by the commissioner would bear no rational relationship to employers' potential liability.

Consequently, we find the previous disability and insurance premium statutes ambiguous on their face. We must look beyond the plain meaning of these statutes to determine whether the legislature intended the last em-

---

7. A medical impairment rating forms the basis for an award of permanent partial disability benefits for non-scheduled occupational injuries. *See* § 8–42–107(1)(b), –107(8)(d). Under the American Medical Association Guides, a scheduled injury listed under section 8–42–107(2) can be converted to a medical impairment rating. *See Mountain City Meat Co. v. Oqueda,* 919 P.2d 246, 251–52 (Colo.1996), *superseded by* § 8–42–107(7)(b)(I), 3 C.R.S. (1999) (providing that scheduled injuries may not be compensated as medical impairment benefits). We assume that a scheduled injury can be converted to a medical impairment rating for the limited purpose of calculating premiums under the insurance premium statute.

8. An employer subject to the provisions of the Act must obtain insurance covering workers'

compensation benefits. *See* § 8–44–101(1). The employer may insure through the Colorado Compensation Insurance Authority (CCIA) or through an authorized insurance carrier. *See id.* Alternatively, an employer may apply for permission to self-insure. *See id.*

Under the Act, the commissioner of insurance must authorize insurance rates charged by every insurance carrier except the CCIA. *See* § 8–44–104. The insurance rates represent an assessment of the risks involved in a given insurance situation and are used to calculate insurance premiums. *See* 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 1:3, at 1–7 to –8 (3d ed.1997). In the field of workers' compensation, insurance rates generally are tied to categories of industries or occupations. *See* 5 Russ & Segalla, *supra,* § 69:31, at 69–62 to –63.

ployer to pay 100% of an employee's benefits in cases where a preexisting industrial disability contributed to the employee's permanent total disability.

## B.

Where a statute is ambiguous on its face, we resort to extrinsic aids to construction that are probative of the General Assembly's intent. *See* § 2–4–204, 1 C.R.S. (1999). In construing the meanings of the previous injury and insurance premium statutes, we consider the General Assembly's objectives, the circumstances under which these statutes were enacted, the legislative history behind the insurance premium statute, and the consequences of the alternative constructions.

## 1.

As we discussed above, our decisions in *Hatch* and *Thompson* were premised on an assumption that the last employer remained liable for 100% of its employee's permanent total disability benefits unless it could apportion part of those costs to the SIF. The closure of the SIF to new injuries and the simultaneous enactment of the insurance premium statute modifying calculation of insurance rates and premiums require us to reevaluate our assumptions regarding apportionment and the full responsibility rule. Accordingly, we must ask what the General Assembly intended to accomplish in enacting the SIF closure and insurance premium statutes. Our review of the legislative history surrounding the passage of these statutes persuades us that, by closing the SIF to cases of permanent total disability involving new injuries, the General Assembly intended to place full liability for permanent total disability benefits on the last employer. Additionally, we conclude that the General Assembly intended to mitigate the costs to an employer held liable for such benefits by requiring its insurer to consider only the medical impairment rating of the last injury when setting the employer's insurance premiums. In turn, an insurer may recoup expenses not covered by an indemnified employer's premiums by increasing its insurance rates and passing these costs to

similarly rated employers in its insurance pool.

The SIF closure and insurance premium statutes find their origins in House Bill 92–1280. *See* ch. 238, sec. 5, §§ 8–46–104 to – 105, 1992 Colo. Sess. Laws 1828, 1830–31. A review of the conference committee hearings on House Bill 92–1280 reveals that the bill was a response to an increasing burden on the SIF that the General Assembly perceived to threaten the solvency of the fund. *See Hearings on H.B. 92–1280 Before the Senate Comm. on Bus. Affairs and Labor*, 58th Gen. Assembly, 2d Reg. Sess. (Audio Hearing Tape Feb. 18, 1992 at 9:59 a.m.). In 1990 and 1991, the projected number of disabled employees admitted to the fund was more than double the number admitted in the forty-four years between 1945 and 1989. *See id.* As a result of the dramatic increases in claims, the SIF's liabilities had begun to exceed its income.

While recognizing the need to close the SIF to new cases, the House and Senate committees scrutinizing House Bill 92–1280 unmistakably intended for employers and their insurers to assume the costs of permanent total disabilities that no longer would be borne by the SIF. *See Hearing on H.B. 92–1280 Before the Senate Comm. on Bus. Affairs and Labor*, 58th Gen. Assembly, 2d Reg. Sess. (Audio Hearing Tape Apr. 1, 1992 at 3:36 p.m.). Particularly illustrative is an exchange between Senator Norton, the principal sponsor of the bill in the Senate, and Gary Pon of the Colorado Compensation Insurance Authority:

Senator Norton:

What are those people with industrial disabilities going to do now? I mean, are we going to lose them through the cracks without the fund?

Gary Pon:

By shutting the fund down, Senator, what would happen is the insurance company that is providing coverage at the time of the most recent injury would be liable for the results of that injury. Now currently what happens with the fund is, when an employee has an injury that is significant enough to render the employee

permanently and totally disabled, but the employee also had a previous industrial disability that when compounded with the most recent injury would render them permanently and totally disabled, then the subsequent injury fund liability comes into play.

*Id.* Similarly, Senator Norton explained to the House and Senate Conference Committee,

> The insurance industry will have to adjust their incomes to take care of [their increased liability after closure of the subsequent injury fund]. . . . There will not be any change in the liability overall in the system. It will just be whether the subsequent injury fund pays or insurance pays.

*Hearings on H.B. 92–1280 Before the House and Senate Conference Comm.*, 58th Gen. Assembly, 2d Reg. Sess. (Audio Hearing Tape May 5, 1992 at 5:48 p.m.).

We find further evidence of the General Assembly's intent to impose full liability on employers in the text of the insurance premium statute as originally enacted. Prior to an amendment in 1993, the insurance premium statute provided that "[t]he insurance carrier or self-insured employer may seek indemnification from any previous employer of the injured employee for a share of benefits proportional to their liability." Ch. 238, sec. 5, § 8–46–105, 1992 Colo. Sess. Laws 1828, 1831. The manifest purpose of this indemnification clause was to permit insurers and employers to recover a proportionate share of costs from previous employers in whose service an injured employee had sustained a partial disability that contributed to his subsequent permanent total disability. Such a provision, however, makes sense only if one assumes that the last employer or its insurance carrier is liable for the full cost of the employee's permanent and total disability benefits.

In 1993, the General Assembly enacted House Bill 93–1356, which struck the indemnity clause from the insurance premium statute, *see* ch. 351, sec. 4, § 8–46–105, 1993 Colo. Sess. Laws 2140, 2142, to avoid placing employers and insurers in the uncertain position of settling claims without knowledge of whether they could recover indemnity from prior employers or whether they would be liable for indemnity should a future claim arise. *See Hearings on H.B. 93–1356 Before the House Comm. on Bus. Affairs and Labor*, 59th Gen. Assembly, 1st Reg. Sess. (Audio Hearing Tape May 6, 1993 at 2:23 p.m.). The committee hearings on House Bill 93–1356 indicate that the General Assembly continued to presume that the closure of the SIF would result in employers assuming full responsibility for payment of permanent total disability benefits. *See Hearing on H.B. 93–1356 Before the Senate State, Veterans, and Military Affairs Comm.*, 59th Gen. Assembly, 1st Reg. Sess. (Audio Hearing Tape May 11, 1993 at 1:34 p.m.).

In contrast to the abundance of legislative history supporting imposition of full liability for permanent total disability benefits on the last employer, our research discloses no support for United's position that the General Assembly intended to shift the costs of permanent total disabilities to disabled employees. We find it unreasonable to believe that in the midst of committee discussion indicating an intent to impose full liability on employers and their insurers, there would be no mention by the members of the General Assembly that they intended to achieve an unprecedented reduction of benefits to permanently and totally disabled employees.

Thus, our review of the legislative history demonstrates that, by closing the SIF to injuries occurring on or after July 1, 1993, the General Assembly intended to place full liability on the last employer in cases where an employee's multiple permanent partial industrial disabilities combine to render him permanently and totally disabled. As Senator Norton explained, the net liability for permanent total disability benefits was to remain the same. Under the SIF closure and insurance premium statutes, the employer and its insurer would assume liability for the entire cost of permanent total disability benefits, including those costs that prior to the SIF's closure to new injuries the employer could have apportioned to the SIF.

The legislative history further supports the conclusion that the General Assembly intended the system set forth in the insurance premium statute to replace SIF funding of

eligible permanent total disability awards in cases where the last injury occurred on or after July 1, 1993. By requiring insurers to calculate premiums based on the medical impairment rating of an injury, the insurance premium statute results in the last employer bearing only a fraction of the total costs of an employee's permanent total disability. Under the provision authorizing the commissioner of insurance to consider the total costs of permanent total disabilities in setting insurance rates, the remainder of the costs of a particular claimant's disability are shared by all employers that are subject to the same rate schedule as the last employer. Consequently, the insurance premium statute performs a cost-spreading function similar to that provided by the SIF while privatizing the administration of the system.

In sum, the General Assembly's object in enacting House Bill 92–1280 was to solve problems created by a fiscally burdensome SIF, not to effect a substantial revision of the benefits received by permanently and totally disabled workers. The House and Senate committees considering the bill specifically addressed whether the bill would result in reduced benefits to injured workers. They concluded it would not. Accordingly, the legislative history conclusively supports imposition of full, unapportioned liability for permanent total disability benefits on the last employer in cases previously eligible for apportionment under the SIF statute.[9]

### C.

The purpose and policy behind the Act further support our interpretation of the previous disability and insurance premium statutes. An interpretation of these statutes that would provide claimants only a fraction of the benefits they historically have received under the Act would be wholly antithetical to the remedial purposes of workers' compensation law.

Traditionally, workers' compensation laws have provided an efficient system for remedying the effects and allocating the costs of industrial injuries. Workers' compensation offers disabled employees a means of support more dignified than other social safety nets, such as welfare, to which the worker and his family otherwise would have to turn. *See* 1 Larson, *supra*, § 1.03(2), at 1–5 to –8. Furthermore, workers' compensation results in the attribution of the costs of industrial injuries to those goods and services that the disabled employee was helping to produce when he sustained his injury. Thus, consumers of those goods and services, rather than society at large, pay the costs of associated industrial injuries in an amount proportionate to their consumption. *See id.* § 1.03(2), at 1–6 to –7, § 1.03(7), at 1–12 to –13.

By adopting an interpretation of the previous disability and insurance premium statutes that allocates the costs of permanent total disabilities to the last employer rather than to the injured employee, we advance the goals of providing a dignified means of support to disabled workers and passing on the costs of industrial disabilities to consumers. Moreover, our interpretation recognizes the longstanding history of providing permanently and totally disabled employees such as Bowland with the full measure of benefits available under the Act.

By way of comparison, were we to adopt an interpretation requiring apportionment of costs between the last employer and the employee, disabled workers would be forced to seek other forms of social relief. In a case where the totally disabled employee previously had suffered from a significant permanent partial disability, the consequences of apportionment could be disastrous for the employee and his family.[10] Under this second approach, the costs of industrial disabilities would be externalized and paid by soci-

9. We reject United's argument that our interpretation of the previous disability and insurance premium statutes rests on a theory of implied repeal. We never have interpreted the previous disability statute to require a reduction of the last employer's liability in cases such as the one now before us. As such, our decision not to broaden the scope of the previous disability statute can

not be understood as an implied repeal of the statute.

10. Unlike recovery in tort, which theoretically makes the injured claimant whole, workers' compensation generally provides the claimant with an income sufficient to protect him from destitution. *See* 1 Larson, *supra*, § 1.03[5], at 1–10.

ety at large rather than factored into the costs of the goods and services and passed on to consumers.

## D.

Based on the preceding review of the previous disability and insurance premium statutes, the legislative history, and the policies underlying workers compensation, we hold that the General Assembly intended to impose full liability on the last employer in cases where multiple industrial injuries result in permanent total disability. This conclusion allows us to harmonize the previous disability and insurance premium statutes. Under our interpretation of these statutes, the General Assembly clearly intended to impose full liability on the last employer in cases where (1) the employee previously has sustained one or more permanent partial industrial disabilities and, (2) on or after July 1, 1993 the employee sustains an additional permanent partial industrial disability, and (3) the combined industrial disabilities render the employee permanently and totally disabled. The SIF statute applies to all such cases of permanent total disability where the last injury occurred prior to July 1, 1993.

In this case we need not consider whether the previous disability statute requires a reduction of benefits when one or more preexisting symptomatic nonindustrial disabilities combine with a subsequent industrial disability to render the claimant permanently and totally disabled. To date, we have presumed that the Act imposes full responsibility on the last employer in such cases. *See Thompson,* 793 P.2d at 578–79; *Hatch,* 690 P.2d at 202; *id.* at 205–07 (Quinn, J., dissenting). We acknowledge, however, the impact the 1999 amendments to the previous disability statute may have on cases involving preexisting symptomatic nonindustrial disabilities where the last injury occurs on or after July 1, 1999. *See* ch. 141, sec. 1, § 8–42–104, 1999 Colo. Sess. Laws 410, 410–11.

■ The ALJ concluded that, at the time of Bowland's back injury in August 1993, he had a preexisting permanent partial industrial disability to the extent of nine percent of the whole person. The ALJ further found that Bowland's back injury rendered him permanently and totally disabled. All three conditions for imposing full liability on United are met. We therefore find United liable for the full, unapportioned amount of Bowland's permanent total disability benefits.

## IV.

United makes two final arguments why it should not be liable for Bowland's permanent total disability award. Neither has merit.

## A.

■ First, United argues that because it is a self-insuring employer, the insurance premium statute is irrelevant to the issue of its liability for Bowland's permanent total disability benefits. We disagree.

■ Although the insurance premium statute expressly regulates the calculation of insurance premiums and rates, it implicitly indicates that the General Assembly intended to impose full liability for disability benefits on the last employer in cases where a preexisting permanent partial disability combines with a subsequent industrial disability to render the employee permanently and totally disabled. Nothing in the insurance premium statute or elsewhere in the Act purports to exempt self-insuring employers from full liability. Both the indemnification clause included in the 1992 version of the insurance premium statute and the weight of legislative history support the conclusion that self-insuring employers are liable for permanent total disability awards to the same extent as employers who insure through an unrelated carrier. This risk is simply another factor that an employer may take into consideration when deciding whether to self-insure.

Accordingly, United's choice to self-insure is purely a business decision and does not relieve it of full responsibility for Bowland's permanent total disability award. The fact that United currently is not taking advantage of the cost-spreading features of the insurance premium statute has no bearing on its legal obligations under the Act.

### B.

United also argues that the interpretation we adopt today results in an illegal double recovery for Bowland. According to United, because it previously paid Bowland permanent total disability benefits for the injuries he sustained between 1987 and 1992, it already has compensated him for nine percent of his permanent total disability. We disagree.

The court of appeals recently addressed this issue in *National Fruit Product v. Crespin*, 952 P.2d 1207 (Colo.App.1997). In that case, the claimant first sustained an industrial injury causing a five percent permanent partial disability. The employer admitted liability and the claimant received permanent partial disability benefits. After the claimant's condition worsened, the case was reopened and the claimant was found permanently and totally disabled. *See id.* at 1208. The employer asserted that it was entitled to offset the claimant's previously awarded permanent partial disability benefits against his prospective permanent total disability benefits. According to the employer, the permanent partial and permanent total disability benefits both compensated the claimant for loss of wages; therefore, the offset was necessary to prevent an illegal double recovery. *See id.*

The court of appeals rejected the employer's reasoning. It found that, although permanent partial and permanent total disability benefits both compensated the employee for lost wages, no offset was necessary because the benefits compensated different losses. *See id.*

We find the reasoning set forth in *Crespin* persuasive and in accord with the majority of jurisdictions that have considered the issue. *See* 5 Larson, *supra*, § 92.02[3], at 92–7, § 92.02D[3], at D92–14 to –17. The workers' compensation system operates on the theory that, in a rational market, the income of a partially disabled worker will be less than that of a whole worker. *See, e.g., ITO Corp. v. Director, Office of Workers' Compensation Programs*, 883 F.2d 422, 426 (5th Cir.1989); *Hastings v. Earth Satellite Corp.*, 628 F.2d 85, 90 (D.C.Cir.1980). Permitting an injured employee to recover permanent total disabili-ty benefits without deducting previously-awarded permanent partial disability benefits implements this theory.

Permanent partial disability benefits awarded pursuant to section 8–42–107 provide an injured employee with compensation for a fixed duration. *See* § 8–42–107. Scheduled injuries under section 8–42–107(2) are compensated in the amount of $176 per week, plus any award available for temporary disability. *See* § 8–42–107(6)(a). Temporary disability benefits provide an award equal to 66.6% of the employee's average weekly wage per week, not to exceed 91% of the state . average weekly wage. *See* §§ 8–42–105, –106. Awards for non-scheduled injuries are computed on the basis of the employee's medical impairment rating and his age. *See* § 8–42–107(8). As the employee increases in age, the award available for a non-scheduled injury decreases. *See id.*

Permanent total disability benefits, on the other hand, generally provide compensation until the employee's death. *See* § 8–42–111. Benefits are in the amount of 66.6% of the employee's average weekly wages per week, not to exceed 91% of the state average weekly wage. *See* § 8–42–111(1).

Where an employee sustains an injury causing a permanent partial disability and, at a later date, sustains a second injury causing permanent total disability, the awards for the successive injuries will not necessarily overlap. The first award for permanent partial disability theoretically compensates the employee for future wage losses. Indeed, this is the function served by allowing recovery of a fixed award in addition to temporary disability benefits for scheduled injuries and using an age multiplier for non-scheduled injuries. *See* § 8–42–107. By providing compensation for future wage loss, the Act operates on the implicit assumption that a worker with a permanent partial disability theoretically will earn less than a worker with no disability.

Thus, when the employee sustains the second injury resulting in permanent total disability, his weekly wage theoretically already is lower than it would have been were he not permanently partially disabled. As such, the

employee's permanent total disability benefits—based on his average weekly wage at the time of the second injury—presumably will be lower than they would have been had the first injury never occurred. *See* § 8–42–104(1); *see, e.g., ITO Corp.,* 883 F.2d at 426; *Hastings,* 628 F.2d at 90. Were we to permit an employer to deduct previously-paid permanent partial disability awards from a subsequent permanent total disability award, we would undermine the provisions for prospective wage loss under section 8–42–107.

■ In the present case, Bowland previously received permanent partial disability benefits for injuries sustained prior to August 3, 1993. Bowland now may receive a full, unapportioned award of permanent total disability benefits for his August 3, 1993 injury. Based on the reasoning outlined above, requiring United to pay Bowland's permanent total disability award without offsetting his previous permanent partial disability award does not result in an illegal double recovery.

The judgment of the court of appeals is affirmed. We remand the case to the court of appeals to return it to the ICAO for further proceedings consistent with this opinion.

Justice KOURLIS specially concurs.

Justice SCOTT does not participate.

## APPENDIX

The Previous Disability Statute

8–42–104, 3 C.R.S. (1998). Effect of previous disability or compensation

(1) The fact that an employee has suffered a previous disability or received compensation therefor shall not preclude compensation for a later injury or for death, but, in determining compensation benefits payable for the later injury, permanent total disability, or death, the employee's average weekly earnings at the time of the later injury shall be used in determining the compensation payable to the employee or such employee's dependents. Notwithstanding any other provision of articles 40 to 47 of this title, no claimant may receive concurrent permanent total disability awards from injuries occurring in this state or any other state.

(2) In case there is a previous disability, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury. In such cases awards shall be based on said computed percentage. Such computation, when applicable, shall be made in the following types of awards under articles 40 to 47 of this title: Permanent total, permanent partial, including scheduled, working unit, and lump sum; except that, in the event the provisions of section 8–46–101 are applicable, such apportionment shall not be made.

The Insurance Premium Statute

8–46–105, 3 C.R.S. (1999). Calculation of premium—permanent total disability—employer may request examination

(1) Effective July 1, 1993, in any case in which an employee previously has sustained permanent partial disability and, in a subsequent injury, sustains additional permanent partial disability and it is shown that the combined industrial disabilities render the employee permanently and totally disabled, then the premiums of the employer in whose employ the employee sustained such subsequent injury shall be determined only on the basis of the impairment rating for such subsequent injury and not on the basis of the employee's permanent total disability. If such employer disputes the impairment rating for the subsequent injury, the employer shall request an independent medical examination pursuant to the procedures set forth in section 8–42–107.2. The finding of the independent medical examiner regarding the impairment rating may be overcome only by clear and convincing evidence. The total cost of the employee's permanent total disability shall not be considered in determining the employer's premiums, but shall be considered by the commissioner of insurance in setting rates.

Justice KOURLIS, specially concurring:

I concur with the majority in concluding that United Airlines must bear the cost of

Bowland's injuries. However, I view that result as a matter more of omission than of specific legislative intent. I do not read either the case law or the statutes as supporting the revival of a full responsibility rule. Rather, it is my view that in cases of multiple industrial injuries resulting in permanent total disability, the current statutory scheme in fact replaces the Subsequent Injury Fund (SIF) with monies from the existing insurance pool, while still permitting employers to apportion liability by avoiding premium responsibility for the cumulative effect of a subsequent injury. Because United Airlines is self-insured, it may not benefit from either the intent or the effect of that scheme of cost-sharing.

When an employee suffers a subsequent industrial injury that results in permanent total disability, there are three choices as to how the costs associated with the prior injury can be allocated. The first choice is that the employer would bear the whole cost of the disability, irrespective of its proportionate origin. This doctrine is called the full responsibility rule. *See Colorado Fuel & Iron Corp. v. Industrial Comm'n*, 151 Colo. 18, 26, 379 P.2d 153, 157 (1962). The second choice is that some source of pooled money – public or private – would bear the cost associated with the prior injury and the employer would bear the cost allocable to the immediate employment injury. The last choice is that the employee would bear the cost of the prior injury him or herself, with the employer bearing only the cost of the later injury.[1]

As the majority recounts, two separate apportionment schemes covered previous disabling injuries prior to July 1, 1993. The SIF provided apportionment by sharing disability costs between employers and a state fund when a worker suffered multiple industrial injuries resulting in permanent total disablement. *See* § 8–46–101, 3 C.R.S. (1999). The previous disability statute, section 8–42–104, 3 C.R.S. (1998), provided apportionment in non-SIF cases, such as those involving permanent partial disabilities and permanent total disabilities resulting from previous non-industrial injuries. *See Askew v. Industrial Claim Appeals Office*, 927 P.2d 1333, 1336 (Colo.1996) (addressing the previous disability statute in the context of a permanent partial disability); *Waddell v. Industrial Claim Appeals Office*, 964 P.2d 552, 553–54 (Colo.App.1998) (recognizing apportionment of the non-industrial portion of a permanent total disability).

In 1992, the legislature closed the SIF to future claims because it was moving toward insolvency. *See* § 8–46–104, 3 C.R.S. (1999). The General Assembly concurrently enacted section 8–46–105, 3 C.R.S. (1999), which provided the method for calculating employer premiums and insurance rates.

The legislative history cited by the majority for the SIF closure statute, section 8–46–104, supports the conclusion that in the new statutes, the General Assembly opted for the second method of funding the portion of a total disability allocable to the prior injury: namely, that a pool of money, in this case, the insurance pool, would pay the cost apportionable to previous industrial injuries in cases of permanent total disability. *See* maj. op. at 1159–1162. In short, the General Assembly reconstituted the SIF from a state-funded pool of money into an insurer-funded pool of money.

I do not agree with the majority that such a choice created or revived a full responsibility rule. The insurance rate statute, section 8–46–105, enacted at the same time as the SIF closure, outlines how employer insurance rates should be calculated. *See* § 8–46–105. It makes no mention of the full responsibility rule. *See id.* Indeed, I view the statute as specifically apportioning premiums so that the last employer is *not* fully responsible for the cumulative permanent total disability.

The legislature did not amend the previous disability statute at the same time that it created the insurance rate statute. Both before and after SIF closure, the previous disability statute expressly stated that apportionment "shall be made" in cases of both permanent total and permanent partial dis-

---

1. A fourth choice might be to assess the costs of the portion of the disability attributable to the prior injury on the prior employer. That alternative is probably impractical for reasons such as lapse of time, insolvency and the like.

ability.[2] *See* § 8–42–104; see also *Mountain Meadows Nursing Ctr. v. Industrial Claim Appeals Office*, 990 P.2d 1090, 1091 (Colo. App.1999) ("The obvious purpose of [§ 8–42–104(2) ] is to make the employer at the time of the employee's last injury responsible only for the disability resulting from that injury and not for any portion of the present disability that results from a prior injury.")

The majority relies on *Subsequent Injury Fund v. Thompson*, 793 P.2d 576 (Colo.1990) and *City & County of Denver v. Industrial Comm'n*, 690 P.2d 199 (Colo.1984) (hereinafter *Hatch* ), to support the proposition that the last employer bears full responsibility for permanent total disablement when the SIF does not cover the injury. I read *Thompson* and *Hatch* to hold only that the SIF does not cover non-industrial injuries. *See Thompson*, 793 P.2d at 579 (holding that the SIF must cover a portion of a worker's total disability costs when the worker suffered a previous industrial injury); *Hatch*, 690 P.2d at 202–03 (holding that the SIF was not liable when a worker's industrial and non-industrial injuries combined to render the worker permanently and totally disabled); *see also Waddell*, 964 P.2d at 554 (noting that *Hatch* "addressed only the question of SIF liability for non-industrial injuries and not the application of § 8–4–104(2)"). These cases do not prohibit apportionment under the previous disability statute in cases of permanent total disability where apportionment to the SIF may not be obtained.[3] In fact, the court of appeals has held that the full responsibility rule does not bar apportionment under section 8–42–104 when there is no SIF liability. *See Waddell*, 964 P.2d at 554 (finding apportionment of non-industrial injury proper under the previous disability

statute when the SIF would not cover the non-industrial injury).

Accordingly, I do not believe that the legislature intended to revive or enact a full responsibility rule in cases of multiple industrial injuries resulting in permanent total disability. Indeed, such an approach would bring workers' compensation law full circle to the policy concerns that led to the creation of the SIF in 1945. Despite any mitigating forces[4], employers may still be reluctant to hire partially disabled workers fearing that the worker would become further injured, causing the employer to bear full responsibility. *See, e.g., Thompson*, 793 P.2d at 578–79 (outlining policy concerns stemming from the full responsibility rule). The corollary to this problem is that partially disabled workers may find it more difficult to gain employment. *See id.* at 579. Reviving the full responsibility rule creates a fundamental imbalance for the last employer who is forced to bear responsibility for the disability, even though that employer may, in fact, be responsible for only a small portion of the injury.

Thus, I do not attribute such an intent to the General Assembly. Rather, it is my view that the legislature intended to create a fund to finance the portion of the injury attributable to an earlier industrial accident through the adjustment of rates and consequent raising of workers' compensation premiums.

That brings me to United Airlines, a self-insurer. In my construction of the case law and statutes, United bears the full cost of the accident solely and only because it is a self-insurer, and has decided not to purchase third-party insurance. The cost of such an

2. In 1999, the General Assembly amended the previous disability statute so that it now reads:

(2)(a) In cases of permanent total disability, when there is a previous disability, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury. In such cases awards shall be based on said computed percentage.

§ 8–42–104(2)(a), 3 C.R.S. (1999). The fact that the legislature later limited application of the statute to cases of permanent total disability indi-

cates that the legislature intended that employers be afforded apportionment in such cases.

3. In both *Thompson* and *Hatch*, the court resolved issues of apportionment under the SIF. *See Thompson*, 793 P.2d at 579; *Hatch*, 690 P.2d at 202–03. The issue of apportionment under section 8–42–104 was not raised by the parties in either case, and thus, was not addressed by the court.

4. Those mitigating forces could include the Americans With Disabilities Act, 42 U.S.C. §§ 12101—12213 (1994).

accident is a factor that comes into play when a large company undertakes a cost-benefit analysis in deciding whether to self-insure.[5]

In conclusion, I agree that the legislature did not intend Bowland to bear responsibility for the portion of his permanent, total disability allocable to a prior injury. However, I do not agree that the General Assembly made a policy decision to shift that burden onto the last employer. Rather, I conclude that the General Assembly intended the insurance pool to absorb the burden of the prior injury, spread over all insureds. The fact that United is self-insured means simply that it does not have access to that pool of money. Accordingly, I join in the majority's result, but differ in my analysis.

---

5. I note that neither the statute nor the legislative history evidence that the General Assembly considered the plight of self-insured employers when changing the SIF scheme; however, the result is the same.