Gary L. SNYDER, D.P.M., R.V.T., Appellant,

v.

COLORADO PODIATRY BOARD, Appellee.

No. 02CA1648.

Colorado Court of Appeals, Div. V.

Feb. 26, 2004.

Rehearing Denied April 1, 2004.

Certiorari Denied Nov. 8, 2004.

498

Gary L. Snyder, Pro Se.

Ken Salazar, Attorney General, Claudia Brett Goldin, Assistant Attorney General, Denver, Colorado, for Appellee.

Opinion by Judge VOGT.

Gary L. Snyder, D.P.M., R.V.T., appeals the order of the Colorado Podiatry Board revoking his license to practice podiatry. We affirm.

Snyder was charged with multiple violations of the Colorado Podiatry Practice Act, § 12–32–101, et seq., C.R.S.2003 (the Act), in connection with his treatment of eleven patients. He was alleged to have engaged in unprofessional conduct by, among other things, failing to meet generally accepted standards of the practice of podiatry; performing a procedure beyond his training and competence; failing to obtain consultations or perform referrals; making incorrect essential entries on patient records; and committing a fraudulent insurance act.

Following a hearing, the administrative law judge (ALJ) found that all but one of the six charged counts had been proved, and she imposed a sanction of a one-year license suspension followed by a two-year period of probation. The Board accepted most of the ALJ's findings and conclusions. However, it concluded that Snyder's performance of ambulatory phlebectomies and injection sclerotherapy above the level of the ankle not only exceeded the permissible scope of podiatric practice under the Act, as the ALJ had concluded, but also—contrary to the ALJ's ruling—constituted a violation of § 12–32–107(3)(t), C.R.S.2003 (performing a procedure beyond the podiatrist's training and competence). In addition, the Board rejected the ALJ's proposed sanction and voted instead to revoke Snyder's podiatry license.

## I.

On appeal, Snyder raises various challenges to the Board's determination that he engaged in unprofessional conduct by performing ambulatory phlebectomies and injection sclerotherapy above the level of the ankle. He argues that, because the Board's authority is limited to regulating the practice of podiatry, it could not discipline him for performing acts outside the scope of podiatry. He also contends that the Board's ruling was substantively incorrect. We disagree with both contentions.

## A.

Section 12–32–107(2), C.R.S.2003, authorizes the Board to revoke the license of a podiatrist who is guilty of any unprofessional conduct. "Unprofessional conduct" includes, as pertinent here, "[a]ny act or omission which fails to meet generally accepted standards of the practice of podiatry," § 12–32–107(3)(i), C.R.S.2003; violating any provision of the Act, § 12–32–107(3)(k), C.R.S.2003;

and performing any procedure beyond the podiatrist's training and competence, § 12–32–107(3)(t).

Podiatry is a limited field of the healing arts. *See* § 12–36–106(3)(d), (m), C.R.S.2003. Persons licensed to practice a limited field of the healing arts, such as podiatrists, are to "confine themselves strictly to the field for which they are licensed and to the scope of their respective licenses." Section 12–36–106(4), C.R.S.2003.

■ The authority given by the General Assembly to the Board under § 12–32–104(1), C.R.S.2003, to "regulate the practice of podiatry" and discipline podiatrists necessarily includes the authority to determine whether specific acts fall within the scope of podiatry. *See Colo. State Board of Medical Examiners v. McCroskey,* 940 P.2d 1044 (Colo.App.1996)(although statutes define general aspects of practice of medicine, it remains responsibility of board of medical examiners to determine whether specific acts fall within broad scope of medical practice for purpose of carrying out its responsibility to discipline physicians for unprofessional conduct, including violations of generally accepted standards of medical practice).

Like the board of medical examiners, the Podiatry Board has the authority and responsibility to discipline practitioners for acts or omissions that fail to meet generally accepted standards of the profession or that violate the Act. To carry out that responsibility, the Board must be able to determine whether a specific procedure performed by a podiatrist is within the scope of podiatric practice.

■ Thus, in this case, it was within the Board's authority to determine that the procedures performed by Snyder were outside the permissible scope of podiatric practice under the Act and to impose the sanction of license revocation based on this and the other incidents of unprofessional conduct found by the ALJ.

### B.

■ We discern no basis for disturbing the Board's conclusion that the procedures performed by Snyder were outside the scope of podiatry.

An ambulatory phlebectomy is a surgical procedure for the removal of varicose veins. Injection sclerotherapy, a non-surgical procedure, involves the use of injections to collapse smaller superficial veins. Snyder performed these procedures on patients, in each case at least partially above the ankle and, in some instances, up to the thigh.

After a detailed review and analysis of the Act, the ALJ concluded that the statutes evidenced an intent to limit the practice of podiatry to practice upon the human foot, toe, ankle, and tendons inserting into the foot, and that Snyder's performance of procedures above the ankle thus exceeded the permissible scope of podiatric practice. The Board agreed, as do we.

Although the interpretation of a statute presents a question of law subject to de novo review, *see United Airlines, Inc. v. Industrial Claim Appeals Office,* 993 P.2d 1152 (Colo. 2000), we are mindful that the Board's interpretation of statutes within its expertise is entitled to deference. *See City & County of Denver v. Industrial Commission,* 690 P.2d 199 (Colo.1984)(construction of statute by administrative officials charged with its enforcement shall be given deference by the courts); *Colo. State Board of Medical Examiners v. McCroskey, supra* (nature of medicine is such that expertise of board of medical examiners is vital to determination whether specific acts fall within statutory definition of practice of medicine); *see also* § 12–32–103(1), C.R.S.2003 (providing that podiatry board shall consist of four podiatrist members and one member from public at large).

The primary goal of statutory interpretation is to give effect to the intent of the General Assembly. When the General Assembly adopts a comprehensive regulatory scheme, the legislation is to be construed as a whole, and, where possible, a harmonious effect is to be given to each of its parts. *United Airlines, Inc. v. Industrial Claim Appeals Office, supra.*

Upon reviewing the Act as a whole, we conclude, as did the Board, that it evidences

an intent on the part of the General Assembly to define the practice of podiatry narrowly and to require podiatrists to confine their practice strictly to the scope of their licenses.

Although the scope of the practice of podiatry varies from state to state, Colorado's Podiatry Practice Act defines "practice of podiatry" as:

(I) Holding out one's self to the public as being able to treat, prescribe for, palliate, correct, or prevent any disease, ailment, pain, injury, deformity, or physical condition of *the human toe, foot, ankle, and tendons that insert into the foot* by the use of any medical, surgical, mechanical, manipulative, or electrical treatment, including complications thereof *consistent with such scope of practice;*

(II) Suggesting, recommending, prescribing, or administering any podiatric form of treatment, operation, or healing for the intended palliation, relief, or cure of any disease, ailment, injury, condition, or defect of *the human toe, foot, ankle, and tendons that insert into the foot,* including complications thereof *consistent with such scope of practice,* with the intention of receiving, either directly or indirectly, any fee, gift, or compensation whatsoever; and

(III) Maintaining an office or other place for the purpose of examining and treating persons afflicted with disease, injury, or defect of *the human toe, foot, ankle, and tendons that insert into the foot,* including the complications thereof *consistent with such scope of practice.*

Section 12–32–101(3)(a), C.R.S.2003 (emphasis supplied).

In addition to these sections referring specifically to conditions of the toe, foot, ankle, and tendons that insert into the foot and enumerating procedures that may be done on these structures "consistent with" the scope of podiatry practice, other portions of the Act further evidence the General Assembly's intent to limit the scope of podiatry even as to procedures done on these parts of the body. Section 12–32–101(3)(b), C.R.S.2003, provides that the practice of podiatry does not include the amputation of the foot or the administration of an anesthetic other than a local anesthetic. Section 12–32–101.5, C.R.S.2003, limits the circumstances in which a podiatrist may perform surgical procedures on the ankle below the level of the dermis.

Other provisions in the Act similarly indicate that the practice of podiatry is to be narrowly, not expansively, defined. Section 12–32–107(3)(t), which defines unprofessional conduct to include performing any procedure in the course of patient care beyond the podiatrist's training and competence, goes on to state that the subsection is not to be "construed to authorize a licensed podiatrist to act beyond the scope of podiatry as defined by section 12–32–101(3)." Section 12–32–109(3), C.R.S.2003, provides that a podiatrist may not use the title "podiatric physician" unless the title is followed by the words "practice limited to treatment of the foot and ankle."

The language of the Act, considered as a whole and in conjunction with the § 12–36–106(4) restriction on practitioners in "limited fields of the healing arts," supports the Board's conclusion that the General Assembly did not intend to permit podiatrists to perform procedures on portions of the body beyond those structures—the toe, foot, ankle, and tendons that insert into the foot—that are specifically named in the Act.

Further support for this conclusion may be found in the legislative history of the 1985 repeal and reenactment of the Act. Transcripts of the 1985 legislative proceedings are included in the agency record; and we agree with the Board that they contain nothing to suggest that the sponsors of the legislation contemplated that podiatrists would treat structures above the level of the ankle. On the contrary, various witnesses affirmed, in response to questioning, that the legislation would not entitle podiatrists to perform procedures on the leg, knee, or hip. A representative of the Department of Regulatory Agencies testified that, although the prior statute had referenced limited procedures involving the leg, "the leg is now nowhere to be found." Hearing on H.B. 1031 before Senate HEWI Committee, 55th General Assembly, First Session (April 11, 1985). A podiatrist testifying in support of allowing properly trained podiatrists to perform ankle surgery

stated, "We aren't looking to working our way up the leg to the knee to the hip. We feel … confident that our knowledge and experience in the foot and ankle … is where we are, where we would like to be and we feel comfortable and confident we can provide quality health care in those anatomic areas." Hearing on H.B. 1031 before House HEWI Committee, 55th General Assembly, First Session (February 20, 1985).

Thus, the legislative history further supports the Board's interpretation of the Act.

Snyder's reliance on *Colo. Board of Medical Examiners v. Raemer*, 794 P.2d 1075 (Colo.App.1990), in support of a contrary conclusion is misplaced. In *Raemer*, a division of this court held that a dentist could perform craniosacral manipulation in the treatment of temporomandibular joint dysfunction even though such manipulation constituted the practice of medicine. However, in so concluding, the division relied on broad language in the statutes governing the practice of dentistry—including language defining "dentistry" to include the performance of a dental therapeutic service "of any kind," *see* § 12–35–110(1)(a), C.R.S.2003—that has no analog in the Podiatry Practice Act. As noted, that Act does not allow podiatrists to perform procedures "of any kind" even on the structures a podiatrist is licensed to treat; rather, the definitions of the "practice of podiatry" in § 12–32–101(3)(a) refer to procedures that may be performed on those structures "consistent with [the] scope of [podiatry] practice." More important, the Act contains no provisions that would permit podiatrists to perform procedures on the leg above the ankle, even if such procedures might also result in pain relief or correction of a physical condition of the ankle or foot.

In our view, permitting podiatrists to perform any type of medical or surgical procedure as long as there is some ancillary benefit to the ankle or foot, as there was in the procedures performed by Snyder, would contravene the intent of the General Assembly, discussed above, to limit the practice of podiatry to the toe, foot, ankle, and tendons that insert into the foot.

Finally, although Snyder focuses on the Board's ruling on the charges relating to his performance of ambulatory phlebectomies and injection sclerotherapy, the ALJ also found numerous additional violations of the Act, and the Board's decision to revoke Snyder's license was based on these "extensive, repetitive, and significant acts of unprofessional conduct, including insurance fraud and lack of honesty."

■ The ALJ's findings of evidentiary fact in regard to the charged violations are not contrary to the weight of the evidence and thus are binding on review. *See* § 24–4–105(15)(b), C.R.S.2003; *Colo. State Board of Medical Examiners v. McCroskey, supra.*

■ Additionally, the Board's decision to substitute its judgment for that of the ALJ with respect to the sanction and with respect to the ultimate fact of Snyder's violation of § 12–32–107(3)(t) has a reasonable basis in law and is supported by substantial evidence in the record. Thus, we may not set aside that determination on appeal. *See* § 24–4–106(7), (11)(e), C.R.S.2003; *Colo. State Board of Medical Examiners v. McCroskey, supra.*

## II.

■ Snyder raises numerous related contentions in support of his argument that he did not receive a fair hearing before the Board. We are not persuaded.

■ The essence of due process is fair procedure. However, no particular or perfect procedure is required as long as the elements of opportunity for hearing and judicial review are present. Due process is satisfied by providing adequate notice of opposing claims, a reasonable opportunity to defend against those claims, and a fair and impartial decision. *Colo. State Board of Medical Examiners v. Hoffner*, 832 P.2d 1062 (Colo.App.1992). Further, the Board's decision is entitled to a presumption of validity and regularity. *See North Colo. Medical Center, Inc. v. Committee on Anticompetitive Conduct*, 914 P.2d 902 (Colo.1996).

Here, Snyder received adequate notice of the charges and had a fair opportunity to defend against them. He was represented by counsel at a five-day hearing, at which numerous expert witnesses testified and ex-

hibits were introduced. The ALJ issued a detailed, fifty-one-page initial decision, to which Snyder filed exceptions. There is no evidence of bias or prejudice on the part of the Board members or the ALJ that would overcome the presumption of honesty and integrity in the proceedings, and the Board's procedures ensured that, consistent with the requirements of due process, its prosecutorial function was kept separate from its decision-making function. *See North Colo. Medical Center, Inc. v. Nicholas,* 27 P.3d 828 (Colo.2001); *People ex rel. Woodard v. Brown,* 770 P.2d 1373 (Colo.App.1989). Finally, Snyder had a right to judicial review by means of this appeal. *See* § 12–32–108.7, C.R.S.2003 (court of appeals has initial jurisdiction to review final actions and orders of podiatry board that are subject to judicial review); § 24–4–106(4), (11), C.R.S.2003.

To the extent Snyder contends that his right to a fair hearing was violated based on constitutional infirmities in the Podiatry Practice Act, we disagree. The provisions of the Act discussed above clearly delineate the limits of the scope of podiatry and thus are not unconstitutionally vague. *See Colo. State Board of Medical Examiners v. Hoffner, supra* (statute is not void for vagueness if it fairly describes the conduct forbidden and persons of common intelligence can readily understand its meaning and application). Additionally, Snyder's contention that the phrase "essential entries," as used in § 12–32–107(3)(v), C.R.S.2003, is unconstitutionally vague was rejected by the Colorado Supreme Court in the context of the Nurse Practice Act, and the court's reasoning applies equally here. *See Kibler v. State,* 718 P.2d 531 (Colo. 1986).

Nor were Snyder's rights violated by the Board's failure to require a higher standard of proof to establish the charge that he committed a fraudulent insurance practice. There is no constitutional requirement of a standard of proof beyond preponderance of the evidence in civil proceedings, *see Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); and the General Assembly has determined that the standard of proof for all violations of the Podiatry Practice Act is the standard applicable in civil proceedings. *See* § 12–32–108.3(6), C.R.S. 2003 (podiatry board disciplinary actions governed by article 4 of title 24); § 24–4–105(7), C.R.S.2003 (except as otherwise provided by statute, requirements of proof in agency proceedings same as in civil trials); § 13–25–127(1), C.R.S.2003 (civil trial standard of proof is generally preponderance of evidence); *Caldwell v. Armstrong,* 642 P.2d 47 (Colo.App.1981)(in civil cases, fraud must be shown by a preponderance of the evidence).

Finally, the ALJ did not abuse her discretion or violate Snyder's right to a fair hearing by admitting expert testimony from a vascular surgeon regarding performance and documentation of ambulatory phlebectomy procedures. In *Melville v. Southward,* 791 P.2d 383 (Colo.1990), on which Snyder relies, the issue was whether a podiatrist's performance of foot surgery, a procedure within the scope of his license, was below the standard of care applicable to such surgery. The supreme court held that expert testimony from a non-podiatrist orthopedic surgeon who was not familiar with podiatric foot care or the standard of care applicable to podiatrists was insufficient to establish a prima facie case of negligence against the podiatrist. Here, by contrast, an expert podiatrist had testified that the standard of care for podiatric surgery required adherence to the standards applicable to general surgery, and the ALJ could properly conclude that testimony by a non-podiatrist surgeon familiar with the standards for performing and documenting ambulatory phlebectomies would be helpful. *See* CRE 702; *People v. Shreck,* 22 P.3d 68 (Colo.2001).

We have considered Snyder's additional contentions of error and conclude that they afford no basis for reversal.

The order is affirmed.

Chief Judge DAVIDSON and Judge DAILEY concur.